Harold B. DORMAN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 21736.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 2, 1968.

Reargued En Banc Nov. 24, 1969.

Decided April 15, 1970.

Mr. William W. Greenhalgh, Washington, D. C. (appointed by this Court) for appellant. Mr. J. Garvan Murtha, Hartford, Conn. (appointed by this Court) also entered an appearance for appellant.

Mr. John G. Gill, Jr., Asst. U.S. Atty., with whom Mr. David G. Bress, U.S. Atty., at the time the brief was filed, was on the brief, for appellee. Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, and Roger E. Zuckerman, Asst. U.S. Attys., also entered appearances for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, and ROBB, Circuit Judges, sitting *en banc*.

## ON REHEARING EN BANC

LEVENTHAL, Circuit Judge:

On December 2, 1966, four men robbed a clothing store in the District of Columbia. Appellant Dorman was tried along with co-defendant Jones, and they were convicted as being two of the participants in the crime. Dorman received a sentence of up to nine years under the Youth Corrections Act. Jones was sentenced to three to nine years in prison.

A division of this court affirmed the conviction of Jones, but reversed the

conviction of Dorman on the ground that his rights were violated when the police entered his house without a warrant in order to arrest him, and saw and seized, without any arrest, a suit of clothes from the robbed store which was put in evidence at the trial. This court granted the Government's request for en banc rehearing of Dorman's appeal, and the record includes a remand proceeding held in the District Court pursuant to order entered by this court after the granting of the rehearing en banc, wherein witnesses were heard and findings made on various issues pertaining to the failure of the police to obtain a warrant.

## I. Validity of Night-Time Warrantless Entry of Defendant's Dwelling To Arrest him for Robbery

### A. Pertinent Circumstances

These are the pertinent facts as they appear from the transcript of the trial and Dorman's motion to suppress the suit of clothes, supplemented by the remand proceedings.

Shortly after 6 p.m. on a Friday evening, four armed men entered Carl's Men's Shop. In the store were three salesmen, two customers, a man and his wife, and a co-owner of the shop. The men entered in pairs. Dorman, one of the first two in the store, and wearing blue-black corduroy pants, asked salesman Holmes if he could see a size 38 blue sharkskin suit similar to one in the window. By the time Holmes returned with such a suit from the stock room the other two men had entered the store, drawn a gun, and announced, "This is it." Dorman, who had also drawn a gun, relieved Holmes of the suit. Holmes and the other five victims were herded into the stock room while the weapons were freely brandished. Jones pointed a gun at the head of another salesman and poked him with it a couple of times. One of the robbers put a gun to the chin of the male customer, Richards, and said, "Do not look," and put the gun to his chin to move his head up so he would not observe them.

The gunmen ushered the six persons into the stock room, stripped them of their billfolds, watches and rings, bound them around the ankles and wrists with neckties taken from a nearby rack, and made them lie on the floor. Two of the robbers remained in the stockroom, pointed guns at the victims and made threats. The other two rummaged about the store, looking for money and clothes of certain sizes. During this period a shot was fired in the back room "when they were passing the gun from one to another."

An officer on traffic duty across from the store saw three men emerge with their arms full of clothes. He pursued one of them, but was unsuccessful. Police were swiftly called to the scene, and they investigated the premises from 7:00 to 7:45 p. m. Detective Blancato found on the floor of a changing room a pair of dark corduroy pants, and copies of a monthly probation report showing the name and address of defendant Dorman. Apparently Dorman left the store wearing the blue sharkskin suit.

Detective Blancato phoned the Identification Bureau and shortly after 8:00 p. m. he learned that the files contained Dorman's photograph. He drove three victims to headquarters, arriving at 8:30 p. m., and the victims made a photographic identification of Dorman.

In accordance with established procedure the detective called the Assistant United States Attorney designated for the purpose, to report the facts of the case, in order to obtain approval to proceed with the arrest of the person believed guilty of the crime. As the District Court stated in the remand findings, this practice insures that a responsible legally trained individual will give his preliminary approval before the matter is referred to a magistrate. The established procedure made it the responsibility of the designated Assistant United States Attorney to locate a magistrate or judge for the issuance of an appropriate warrant. Detective Blancato began typing out the affidavit to accompany the application for an arrest

warrant. When he was about finished the Assistant United States Attorney called him and told him that no magistrate was available, but that since a felony was involved, Dorman could be arrested without a warrant. The District Judge's remand findings set forth that the designated Assistant had no recollection of the events of that evening, that the then U.S. Commissioner, if called, would have testified that he probably was not available apparently because Friday nights he had dinner with his mother. The judge of the Court of General Sessions designated for the purpose of authorizing warrants at that time was the late Honorable Andrew Howard. He died prior to the remand proceeding.

The remand findings set forth the circumstances which in the opinion of the District Judge justified Dorman's arrest without a warrant as follows: The police had positive identification of three eyewitnesses, and positive evidence of Dorman's current address. They had reason to believe Dorman might flee when he became aware of the loss of his probation papers identifying him. They knew Dorman and his associates were dangerous—they were armed and had physically abused their victims. The most likely place to find him after 10 p. m. was his home. The District Judge credited their testimony that the only purpose of the visit to his home was to arrest him. They needed no additional physical evidence.

About 10:20 p.m. the police arrived at Dorman's home, knocked twice and announced their identity. Dorman's mother answered the door, in her nightgown. When the police said they were looking for her son, she told them that he had been there but had left some minutes earlier, and suggested that if they did not believe her, they could come in and look for themselves. At that point, "We heard a noise from one of the back bedrooms." In the belief that Dorman was hiding within, the police brushed past Mrs. Dorman and encountered one Allen, a man friend of Mrs. Dorman who lived in the apartment, coming out of a bedroom.

Blancato and the officers continued their search for Dorman. Some policemen looked in the other rooms, and behind a sofa pulled far enough away from the wall to conceal a man. Blancato pushed open the slightly-ajar door of a walk-in closet with the barrel of his shotgun. Inside the closet, "right in front of us," was a blue suit. The unhemmed cuffs were visible beneath the suit jacket. The suit bore the label of Carl's Men's Shop.

Blancato left two of his men in the apartment to apprehend Dorman if he returned. The District Court credited his statement that this was with the acquiescence of Mrs. Dorman because it lessened the danger of a shoot-out and for that reason was preferable to a stake-out.

B. *General Requirement of Need for Warrant To Enter a Home Without Consent In Order To Search for a Suspect Sought for Arrest*

The issue is whether the police acted unreasonably, and in violation of constitutional rights, when they proceeded, in furtherance of their objective to arrest a suspect they had probable cause to believe was an armed felon, to make a warrantless, unconsented, non-forcible entry into his home late in the evening, at a time some few hours after the offense and within an hour after they obtained eyewitness identification of the suspect, and when a magistrate was not readily available.

The Supreme Court has not explicitly passed on this question.[1] The literature abounds in discussion of the permissibili-

---

1. Justice Harlan, in Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), noted that "whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest

ty of an arrest made without a warrant, but there is little if any analysis focusing on entry into a dwelling for the purpose of an arrest. However, we think the pertinent principles, and their application to the case before us, are fairly to be apprehended from the Fourth Amendment precedents, keeping in mind the many circumstances, permutations and variables that must be taken into account in the ultimate determination of reasonableness.

The Fourth Amendment proclaims: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

 The Fourth Amendment protects a right of privacy. This is a right that is increasingly recognized in decisions involving this and other provisions of the Constitution as a core protection safeguarding all citizens against unwarranted intrusions by police and other government officials.[2]

 The Fourth Amendment provides protection even as to arrest in a public place, though in such cases the requirement is only that there be probable cause and there is no additional requirement of recourse to a warrant.[3] A greater burden is placed, however, on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.[4] In general a home may not be searched without a warrant notwithstanding probable cause.[5]

 It is not our province to reconsider the pertinent Supreme Court decisions.[6] The requirement of a warrant, as now generally understood, rests primarily on the conception that it is for a judicial officer, and not the prosecutor or police, to determine whether the security of our society, which is essential to the maintenance of a rule of law, requires that the right of privacy yield to a right of entry, search and seizure, and what limitation and specification of entry may be appropriate and reasonable. Justice Jackson's pen made the point memorably in the oft-quoted passage in Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * * The right of officers to thrust themselves into a

warrant could not have been sought" raises a "grave constitutional question." 357 U.S. at 499–500, 78 S.Ct. at 1257.

2. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

3. Ford & Kimble v. United States, 122 U.S. App.D.C. 259, 352 F.2d 927 (1965).

4. *See* Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); District of Columbia v. Little, 85 U.S.App. D.C. 242, 178 F.2d 13 (1949), aff'd on other grounds, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950).

5. Justice Butler said in Agnello v. United States, 269 U.S. at 33, 46 S.Ct. at 6: "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."

6. There is scholarship tending to show that some of the earlier key provisions on the necessity of a warrant misread the lessons of history. T. Taylor, Two Studies in Constitutional Interpretation 38–41 (1969).

home is * * * a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

The general need for and importance of a warrant, in regard to Fourth Amendment issues, is a doctrine of continuing and increasing vigor. In Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court overturned a precedent set only eight years previous[7] to hold that searches incident to administrative inspections are subject to the warrant requirement.[8]

In the light of the purpose of the Fourth Amendment's prohibition of "unreasonable" searches and seizure, to safeguard the privacy and security of individuals against arbitrary invasions by government officials, the Court reiterated that "except in certain carefully defined classes of cases," a search of private property without proper consent is "unreasonable" unless authorized by a valid warrant (387 U.S. at 528–529, 87 S.Ct. at 1731), the exception being viewed as one to permit "prompt inspections, even without a warrant * * * in emergency situations." (387 U.S. at 539, 87 S.Ct. at 1736).

We also take note of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), where the Court importantly restricted the scope of a search of premises that could be made without a warrant on the ground that it was incident to an arrest, restricted it to the area immediately within the access of the suspect which might yield weapons or other means of escape or danger.

■■ We now come to the question whether the general requirement of a warrant as a condition for entry into a house is subject to an exception where the entry is for the purpose of making an arrest of a suspected felon. As we shall later point out, the requirement of a warrant may be excused where circumstances do not tolerate delay, like that incident to obtaining a warrant, of an officer making an arrest. But the basic principle, the constitutional safeguard that, with room for exceptions, assures citizens the privacy and security of their homes unless a judicial officer determines that it must be overridden, is applicable not only in case of entry to search for property, but also in case of entry in order to arrest a suspect. This is the rule that was declared by Judge Prettyman, a student of this problem, after consideration of the authorities [9] in Morrison v. United States, 104 U.S.App. D.C. 352, 355, 262 F.2d 449, 452 (1958):

The officers entered the house to make a search. It was, to be sure, a search for a person rather than the usual search for an article of property, but it was a search. The officers made this indubitably clear in their testimony; they went into the house to look for Morrison. It is true they intended to arrest him if they found him, and so the ultimate objective was an arrest. The Government urges that this latter fact requires that we apply the rules of law pertaining to arrest rather than the rules governing search. But the search was a factual prerequisite to an arrest; it was the first objective of the entry; the officers did in fact search the house.

---

7. Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).

8. This was the conclusion of Judge Prettyman in District of Columbia v. Little, supra note 4.

9. Judge Prettyman took particular account of his opinions in Smith v. United States, 103 U.S.App.D.C. 48, 254 F.2d 751, cert. denied, 357 U.S. 937, 78 S.Ct.

1388, 2 L.Ed.2d 1552 (1958); and in District of Columbia v. Little, 85 U.S. App.D.C. 242, 246, 178 F.2d 13, 17 (1949), affirmed on other grounds, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950). The approach of the Little opinion was recently adopted by the Supreme Court in Camara v. Municipal Court, supra note 8 and text.

They entered to make a search as a necessary prerequisite to possible arrest.

The same principle applies to an unconsented entry for the purpose of arrest, even though as in this case there was no intent to search the house for property, and the search for the suspect was not specifically visualized at the outset but was a prospect inherent in the situation. Subject to exceptions for circumstances, that constitutional principle prohibits invasion of the privacy of the home by unconsented entry unless need therefor has been determined by a warrant.

C. *The Principle of Urgent Need as Establishing an Exception Justifying Warrantless Entry To Make An Arrest in Situations like the Case at Bar*

 The principle of need operates to justify a judicial officer in issuing a warrant authorizing an invasion of the privacy of a home, provided he acts within the bounds of probable cause and reasonableness. Another and narrower principle of need, a principle of urgent need, also operates to justify warrantless entries with requisite need determined by an officer and not by a court.

There is precedent stating that every case, whatever the officer or his mission, is governed by the principle requiring a warrant unless "an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate."[10]

It is possible that some such unifying field theory may be attainable. But it probably serves to focus analysis and provide clarity of the justification for a warrantless entry for purpose of arrest if there is put to one side the particulars of cases involving, say, administrative searches, where the exception has been cast in terms of "emergency,"[11] or searches of homes not involving any element of entry for purpose of arrest. The courts have always recognized the case of arrest as a case involving its own considerations.[12]

The scope of warrantless searches in cases of arrest reaches not inconsiderable breadth by virtue of the doctrine upholding a warrantless search made incident to a lawful arrest, where the area and purpose of the search serve to protect the arresting officer or avoid escape or destruction of evidence.[13]

Another doctrine excusing failure to obtain a warrant in case of entry for arrest has been cast in terms of "exigent circumstances," or "necessitous circumstances."[14] While some decisions also refer to condition of "hot pursuit," this term is not a limitation but rather an illustration of the kind of exigent circumstance justifying entry without a warrant to arrest a suspect.[15]

In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the majority conspicuously avoided the "hot pursuit" formulation put forward by the concurring judges, and instead focused on the danger of an armed rob-

10. District of Columbia .v. Little, *supra* 85 U.S.App.D.C. at 246, 178 F.2d at 17. This standard was reiterated as applicable to forcible entry into a house, in Chappell v. United States, 119 U.S.App. D.C. 356, 359, 342 F.2d 935, 938 (1965).

11. Camara v. Municipal Court, *supra.*

12. Including, e.g., Agnello v. United States, *supra*, note 5.

13. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

14. *See, e.g.,* Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889

(1968), that "in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances." See also Chappell v. United States, 119 U.S.App.D.C. 356, 360, 342 F.2d 935, 939 (1965); Jackson v. United States, 112 U.S.App.D.C. 260, 302 F.2d 194 (1962); Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958).

15. Thus Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 refers to hot pursuit as an instance of exigent circumstances.

ber at large, saying (pp. 298–299, 87 S. Ct. pp. 1645–1646):

We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, "the exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153. The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

 Terms like "exigent circumstances" or "urgent need" are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant, and that it is only in the light of those circumstances and that need that the warrantless search meets the ultimate test of avoiding condemnation under the Fourth Amendment as "unreasonable." While the numerous and varied street fact situations do not permit a comprehensive catalog of the cases covered by these terms, it may be useful to refer to a number of considerations that are material, and have particular pertinence in the case at bar.

First, that a grave offense is involved, particularly one that is a crime of violence. See, e. g., Warden v. Hayden, supra; McDonald v. United States, 335 U. S. 451, 459, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (concurring opinion of Justice Jackson). Contrariwise the restrictive requirement for a warrant is more likely to be retained, and the need for proceeding without a warrant found lacking, when the offense is what has been sometimes referred to as one of the "complacent" crimes, like gambling.[16]

Second, and obviously inter-related, that the suspect is reasonably believed to be armed. Delay in arrest of an armed felon may well increase danger to the community meanwhile, or to the officers at time of arrest. This consideration bears materially on the justification for a warrantless entry.[17]

Third, that there exists not merely the minimum of probable cause, that is requisite even when a warrant has been issued,[18] but beyond that a clear showing of probable cause, including "reasonably trustworthy information," to believe

---

16. As in e.g. Accarino v. United States, 85 U.S.App.D.C. 394, 179 F.2d 456 (1949), where the suspects had been under surveillance for weeks, and there was a forcible entry without announcement of purpose. Accarino quotes the language of Little, discussed supra, note 10. Compare Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

17. Warden v. Hayden, supra; Chappell v. United States, 119 U.S.App.D.C. 356, 352 F.2d 935 (1965).

18. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In Spinelli the tip of an unidentified informant was held not sufficiently corroborated to establish probable cause for an arrest warrant. Hearsay may be sufficiently corroborated by other items to establish a context of probable cause. Ker v. California, 374 U.S. 23, 36, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Lovelace v. United States, 357 F.2d 306, 311 (5th Cir. 1966).

that the suspect committed the crime involved.[19]

Fourth, strong reason to believe that the suspect is in the premises being entered.[20]

Fifth, a likelihood that the suspect will escape if not swiftly apprehended.

Sixth, the circumstance that the entry, though not consented, is made peaceably.[21] Forcible entry may in some instances be justified.[22] But the fact that entry was not forcible aids in showing reasonableness of police attitude and conduct. The police, by identifying their mission, give the person an opportunity to surrender himself without a struggle and thus to avoid the invasion of privacy involved in entry into the home.

Another factor to be taken into account, though it works in more than one direction, relates to time of entry—whether it is made at night. On the one hand, as we shall later develop, the late hour may underscore the delay (and perhaps impracticability of) obtaining a warrant, and hence serve to justify proceeding without one. On the other hand, the fact that an entry is made at night raises particular concern over its reasonableness, as indicated in Justice Harlan's opinion in Jones v. United States, *supra,* and may elevate the degree of probable cause required, both as implicating the suspect, and as showing

that he is in the place entered (*see* note 20).

We see no basis for disturbing the judgment of the District Court that the case at bar presented the kind of exigent circumstances and urgent need that justified an entry into Dorman's home without the delay incident to a warrant. Dorman had been positively identified as one who had committed a crime of violence. He and his associates had been armed and abused their victims. There was no special knowlege that he was home, but *concepts of probable cause and reasonableness prima facie justify looking for a man at home after 10 p. m.*

There was at least a possibility that delay might permit escape, when and if the suspect came to realize his papers had been left behind. These factors are offset somewhat, but not decisively, by the circumstance that the entry after 10 p. m. came some four hours after the offense. This was not a case of hot pursuit, unless that term is to be stretched beyond all reasonable meaning. But the ultimate underlying factors were similar to those involved in a case of hot pursuit. The police were still dealing with a relatively recent crime, and prompt arrest might locate and recover the instrumentalities and fruits of the crime before otherwise disposed of. And the delay was not of their own making, which might undercut the showing of reason-

19. Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L.Ed.2d 142 (1964).

There is some indication that at common law the degree of proof in hand was material in determining whether there was not merely probable cause for arrest, but authority for a "breaking." See Judge Prettyman's opinion in Accarino v. United States, 85 U.S.App.D.C. 394, 398–400, 179 F.2d 456, 460–61 (1949), cited as a comprehensive discussion in Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

20. Warden v. Hayden, *supra;* Washington v. United States, 134 U.S.App.D.C. 223, 414 F.2d 1119 (February 28, 1969) ; Smith v. United States, 103 U.S.App.D.C. 48, 254 F.2d 751, cert. denied, 357 U.S.

937, 78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958).

It may be noted that Rule 41(c) of the Federal Rules of Criminal Procedure authorizes warrants to search for property at night only if the affidavits are "positive" that the property is in the house or on the person named.

21. *See* Chappell v. United States, 119 U.S. App.D.C. 356, 359, 342 F.2d 935, 938, (1965) ; Ellison v. United States, 93 U.S. App.D.C. 1, 206 F.2d 476, 478 (1953).

The special considerations pertinent in the case of forcible entry are discussed in the *Accarino* and *Miller* opinions *supra* note 19.

22. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

ableness. The courts have respect for the intelligent law enforcement activities of the police, situated as they are in the front line of the campaign for law and order, and this case plainly depicts police officers engaged steadily and systematically in the identification and pursuit of the criminal suspects. Last, but not least, the entry was made peacefully, and after announcement of purpose.

■ The search made upon peaceable entry was only to locate the person of the suspect, on suspicion that the noise heard was made by the suspect in hiding. If the entry to make an arrest was lawful, the police acted reasonably in looking behind sofas and in closets to locate the suspect. There was no rummaging of drawers, etc., to cloud the purpose of the police. Since we hold that the police acted reasonably and lawfully when they took the action without a warrant of entering the house and searching for Dorman in appropriate places, no valid objection can be made to their conduct, when in the course of the search in the closet for Dorman they saw the uncuffed trousers readily identifiable as coming from the store that had been robbed, in seizing this clothing notwithstanding the absence of a warrant. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

### D. *Delay That Would Have Been Involved In Obtaining a Warrant*

To complete the analysis we must consider the other side of the question: what delay would have been involved in obtaining a warrant? There are emergencies, including a close-running hot pursuit, which cannot brook even a delay of minutes. However, in the case before us, involving as it did an investigation that required a visit to a police central office in order to obtain information (here, identification of photograph), and thereby facilitated access to the chambers of a judge or commissioner, there is no testimony that the kind of short delay inherent in the making of any application for a warrant would be intolerable. As Judge Burger has noted:

"That delay may be encountered, however, is not controlling on whether a warrant is required; securing a warrant always involves some additional time." Chappell v. United States, *supra* note 21.

Responsible police are aware that a responsible procedure which accords to the police the latitude for intelligent law enforcement but withholds absolute discretion is the sound approach for securing the overall combination of law and justice that is the inspiration of a democratic society.

And so it was that at about 8:30 p. m., in accordance with established produre, Detective Blancato began typing up the application for an arrest warrant, while the Assistant United States Attorney took steps to locate the appropriate magistrate.

The circumstances that unfolded extended the delay incident to obtaining a warrant considerably, and, in the view of police and prosecution, unduly. The General Sessions judge assigned to this duty was not available. We don't know why, but even the most reasonable and best-regulated of procedures sometimes yawns at the seams, and the question arises as to the consequence. It was a Friday night and the (part-time) commissioner was not available, possibly having dinner at his mother's.

It has been suggested that in these circumstances the police and prosecution had no choice but to try, with all diligence, to obtain a warrant from other sources. Although 18 U.S.C. § 3041 provides that any justice or judge of the United States, or state judge or mayor of a city, may arrest for any offense against the United States, in practice in this jurisdiction only the U.S. Commissioner (now the U.S. magistrates), judges of the Court of General Sessions and judges of the United States District Court are called upon with respect to the issuance of warrants. Had the prosecutor persisted he could probably have located one of these judges. Counsel have stipulated that there were as many as

119 justices or judges of the United States authorized to issue a warrant (excluding the judges of General Sessions), though one may cock a skeptical eye at the scenario of a knock on the door of, say, a judge of the Court of Customs and Patent Appeals, to ask him to take on the unfamiliar task of determining whether an affidavit established probable cause for an arrest warrant.

For all practical purposes the then-applicable procedure provided the equivalent of a state trial judge on assignment for consideration of evening applications for the arrest warrant. With the happenstance of unavailability this particular night, it was reasonable, taking into account the circumstances already related (under C), to make an arrest without risking the further delay incident to locating another judge to issue a warrant. Other courts have noted the materiality of the difficulty of obtaining a warrant late at night,[23] or in the early morning hours before the start of a normal working day.[24]

We have no basis for saying that a system of consideration of applications for warrants is "unreasonable" unless it provides a scheduled term of court at night. What is involved is a question of allocation of resources, and possible diversion of resources from needs that stand higher in the interest of justice. The Court of General Sessions did indeed experiment in 1968 with a system of Court sessions at night and over the weekends, and gave up the experiment on reaching the conclusion that it amounted overall to a diversion of judges from busy courtroom schedules to an assignment of minimal activity and accomplishment.

While we do not fault the action taken in the case at bar as unreasonable, we are also concerned with the reasonableness of the overall provision for nighttime warrants. Various suggestions for inquiry were made in the dissent to the original panel opinion. We are advised, both at argument and by documents lodged with the court, that the prosecution officials have had conferences with the two new magistrates authorized for this District pursuant to the Federal Magistrates Act. The magistrates have set up a systematic schedule for availability at home, where a duplicate set of seals is maintained. It may well result that this will represent greater availability in fact than the prior system, taking into account that for these magistrates the issuance of warrants represents a prime activity, to be pursued diligently, rather than an extra duty superimposed on daytime trial occupation. In any event, an effort has been begun to regularize and enhance availability of magistrates outside normal office hours for the purpose of issuing arrest and search warrants.

The procedure contemplates screening by Assistant United States Attorneys before law enforcement officials make such application to the magistrate at home. Each month the United States Attorney prepares a list of Assistant United States Attorneys available during that month at night and over weekends for access by law enforcement officials who wish to secure arrest and search warrants. A copy of that list is sent to the Metropolitan Police Department, and the various other law enforcement agencies who may have need of this service, the Park Police and Capitol Police, the local field offices of the FBI, Postal Inspector, Secret Service and Bureau of Narcotic Drugs.

In addition to the considerations already mentioned, a warrant procedure available for late hours and weekends has an advantage, from the police-prosecution point of view, of providing an extra measure of protection. In doubtful cases where a warrantless arrest may be undermined by a finding of lack of probable cause the intervening judgment

---

23. See Ker v. California, *supra*, 374 U.S. at 42, 83 S.Ct. 1623.

24. United States v. Pierce, 224 F.2d 281 (6th Cir. 1955), affirming 124 F.Supp. 264 (N.D.Ohio 1954).

of the magistrate provides an additional weight that may uphold the arrest. United States. v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The police-prosecution may also be protected against a contention that the entry of the particular premises was invalid as "unreasonable" because there was no reasonable basis for belief that the suspect was in those premises, if the magistrate adds to the normal arrest warrant under Rule 4 an authorization to enter designated premises similar to that customarily made in a warrant under Rule 41 to search a named place for property.[25]

In any event, we are satisfied that the program that has been developed in the District of Columbia following conferences between the prosecution and the magistrates has the hallmarks of reasonableness, evidencing as it does an awareness of the importance of the warrant requirement and a resolve to satisfy that requirement, unless particular circumstances intervene to establish urgent need for a warrantless arrest or search. Time may reveal weaknesses and point the way to supplements in the program. The program as it stands suffices to obviate any need for interjection by the court at this time, e. g., for consideration of reversal of this conviction for the purpose of a prophylactic rule. We believe that affirmance of the conviction is in the interest of justice.

## II. *Other Issues*

A. Appellant Dorman contends he was prejudiced, and reversal is required, because of the action taken by the trial court in revoking bail of Dorman and his codefendant Jones during trial, and stationing marshals in close proximity to defendants in court for the remainder of the trial.

A similar contention was presented by co-defendant Jones, and was rejected when this court, in an opinion written by Judge Wright for the panel, affirmed the conviction of Jones. The order of this court granting the rehearing en banc requested by appellee of the order of the division reversing Dorman's conviction left untouched the order affirming the conviction of Jones. However, to obviate any possible misapprehension Part III of the opinion written by Judge Wright and issued May 5, 1969, the portion dealing with the revocation of bail and stationing of marshals, to the extent reprinted as an Appendix for this opinion, is adopted by the court en banc in affirming Dorman's conviction.

██ B. At trial the Government elicited testimony from witness Holmes that he had identified appellant at a lineup conducted the morning after the

---

25. Rules 3 and 4 of the Federal Rules of Criminal Procedure providing for issuance of an arrest warrant do not have as strict requirements as Rule 41 pertaining to warrants to search for property. Thus, Rule 41 is limited to judges and commissioners of courts of record, and does not include e.g. a mayor or justice of the peace, who is authorized to commit for an offense against the United States, *see* 18 U.S.C. § 3041, and is therefore authorized to issue an arrest warrant under Rule 3.

Significantly, for present purposes, Rule 41 requires that the search warrant specifically name the place (or person) to be searched. Rule 4 requires designation of the person to be arrested (leaving aside the subject of John Doe warrants), but does not designate the place where he is to be arrested. Nor does Form 12 provide for this. While there is no strict logic in the matter it seems to be accepted, at least by implication, that the obtaining of an arrest warrant is material in supporting a search of premises as not "unreasonable" even though the magistrate has not passed upon the need for invasion of privacy of the premises. If that issue should arise, however, a judgment by the magistrate would obviously be helpful. *Compare* United States v. Ventresca, *supra*.

Similarly helpful could be an authorization, like that contemplated by Rule 41, to enter the premises at night.

The propriety of referring to search warrant procedures as a guide to reasonableness in arrest warrant cases appears from Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

offense. Appellant objected that he had not been represented by counsel at this lineup. The Court overruled this objection since the lineup had been held prior to the issuance of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967). During argument at the bench on appellant's objection, the prosecutor indicated that in addition to the lineup there had been a prior photographic identification. Appellant now urges that this court remand this case for further proceedings on the suggestiveness of this photographic identification. No request for a Stovall v. Denno [26] hearing was made in the District Court. We do not think that the interests of justice require such a course where, as here, the record discloses nothing more than the fact that there was a photographic identification, and there is no issue of suggestiveness that is "plausibly tendered by the circumstances" that are disclosed in the record. Calvin Smith v. United States, 134 U.S.App.D. C. 92, 413 F.2d 366 (1968).

Affirmed.

### APPENDIX

Part III of Opinion of the Court issued May 5, 1969, written by Circuit Judge Wright, with the concurrence of Chief Judge Bazelon and Circuit Judge Leventhal, in No. 21,664, Nathaniel Jones v. United States of America, and No. 21,736, Harold B. Dorman v. United States of America.[27]

### III

Appellants were at liberty on bail at the commencement of the trial. At the end of the first day the judge told the defense lawyers: "The feeling in this case is pretty intense danger-wise and I am very much disposed to commit these men under the circumstances. * * * [O]ne of these witnesses was just para-

lyzed and I think most of them are." The judge then ruled:

"* * * At this time the two defendants will stand committed in light of the actions known to the Court, as well as their failure to respond timely on reconvening of the Court and the strong evidence in this case, and in the light of the menacing manner demonstrated by the two defendants to government witnesses."

The next day each appellant had a Deputy United States Marshal seated behind him at counsel table, and the marshals so remained through the trial. The defense objected to this, claiming that it would prejudice appellants in the eyes of the jury, the jury being led to believe that appellants had done something wrong, or that the judge now felt that they were guilty.

On appeal appellants renew this claim. They argue that the revocation of bail was unjustified and that the placing of marshals behind appellants prejudiced them before the jury.

We think the trial judge might have given a more complete statement of his reasons for revoking bail; likewise, he might have taken measures to minimize the impact on the jury of the fact that the defendants were now in custody—for example, there seems to be no clear reason why marshals had to be stationed right next to the defendants. We can envisage situations where action of this type by a judge might be assumed to be prejudicial. For example, if the jury had been sitting for a good part of a month on several criminal cases, and in cases where defendants were in custody marshals were *not* placed near the defendants, then if the trial judge, in the middle of a trial and without compelling reasons, revoked a defendant's bail and placed a marshal right next to him, the jury might well assume that some terri-

---

26. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967).

27. Judge Leventhal concurred in the affirmance of No. 21,664, Nathaniel Jones

v. United States of America and dissented in the reversal of No. 21,736, Harold B. Dorman v. United States of America.

ble piece of information had been revealed to the judge indicating that the defendant was either very dangerous or very guilty.

However, the record here does not show such a situation. We do not know how long the jury had been sitting, and we do not know whether it was the general practice of the judge to station marshals near all defendants who were in custody. We have examined the trial transcript and we find that the judge conducted an otherwise fair and impartial trial. We will not assume, on this record, that the revocation of bail or the placement of the marshals illegally prejudiced the defendants. Moreover, one of the reasons the court gave for revoking bail—failure of the defendants to attend court on time—does provide an adequate basis for that action.

 In so holding, we are not unaware of the teaching of the Supreme Court in Bitter v. United States, 389 U. S. 15, 16, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1968):

> "A trial judge indisputably has broad powers to ensure the orderly and expeditious progress of a trial. For this purpose, he has the power to revoke bail and to remit the defendant to custody. But this power must be exercised with circumspection. It may be invoked only when and to the extent justified by danger which the defendant's conduct presents or by danger of significant interference with the progress or order of the trial. * * *"

We take an equally stringent view of any action which creates an appearance of danger in a trial. Trials should be conducted in an atmosphere of impartiality; the jury should be allowed to weigh the evidence without feeling the terror of impending doom if they acquit the defendant. When a judge conducts a trial in a way that can only impress upon the jury the dangerousness of the men on trial, this impartial search for truth aborts. Therefore, the judge should be at pains not to act precipitately. He should revoke bail only where that action is clearly required; and he should shackle the defendants in court, whether with chains or with marshals, only on a clear showing that the defendants pose an immediate threat to the peace and order of the trial.

BAZELON, Chief Judge (concurring in the result).

I am inclined to agree with Judge Wright, infra, that the nighttime search of Dorman's apartment was not exempted from the fourth amendment's warrant requirement by Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). I need not reach this question, however, because I conclude that any error in admitting the fruit of this search was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Almost from the time of the robbery itself, the evidence implicating Dorman was overwhelming (e. g., the abandoned probation papers and the eyewitness identifications). Just as this evidence reduced the need for Hayden-like pursuit of a fleeing, unknown suspect, it also establishes that any error here was harmless under Chapman. See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

J. SKELLY WRIGHT, Circuit Judge (concurring in part and dissenting in part):

I concur in Part II A and B of the court's opinion.[1] I respectfully dissent from Part I which upholds a nighttime warrantless search of a home. As I read the majority opinion, it upholds the search, to some extent at least, on the

---

1. As to the identification issue discussed in Part II B, the court notes that the arrest occurred before United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967). Since the Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L. Ed.2d 1199 (1967), issue is a constitutional one, it may be raised collaterally. Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969).

theory that the new system for issuing warrants after office hours may work better than the one in effect at the time of this search. As I see it, constitutional rights cannot be denied by the malfunctioning of a system designed to protect them. In affirming the judgment of the District Court, I submit that the privacy of homes generally in the District of Columbia would be better protected under the Fourth Amendment from official intrusion if the court here had simply held that the evidence of guilt is so overwhelming[2] that beyond a reasonable doubt the admission of the fruit of the illegal search did not taint the conviction. Chapman v. California, 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967).

On December 2, 1966, four men robbed a clothing store in the District of Columbia. Appellant was tried and convicted as one of the participants in the crime. On appeal Dorman argues that his rights were violated by the police in searching his house at night without a warrant and accordingly the fruit of that search—a suit of clothes from the robbed store—should not have been allowed in evidence.

The store was robbed at about 6:15 on a Friday evening. Several clerks and customers were in the store at the time, and a policeman was on duty nearby. The policeman saw the robbers emerge and chased them in vain. Other police were summoned, including Detective Blancato, who was in charge. The police found some papers apparently left by one of the robbers which contained the name and address of Dorman. At 8:00 P.M. they took two of the witnesses to the police station where the witnesses identified Dorman from a photograph as one of the perpetrators of the crime. Detective Blancato then "sat down and started typing up an application for a warrant" while his partner called the Assistant United States Attorney on duty at the time. Dectective Blancato testified that he had almost finished typing up the application when the Assistant United States Attorney called back and "told us that they were unable to locate a judge." He testified that the attorney told them that since the crime was a felony they could go ahead and arrest Dorman without a warrant.

Detective Blancato then rounded up a number of policemen and proceeded to Dorman's home. Some officers stayed outside the apartment house and approximately six officers, most in plain clothes, went to the door of Dorman's apartment. Two of the officers were carrying shotguns. They arrived at the apartment at about 10:20 P.M. The police knocked on the door and Dorman's mother, who lived in the apartment, answered. Dorman's mother, in the words of the prosecutor, "was in her nightgown or something equally gossamer at the time." The police made known their purpose to arrest Dorman, asked if he was at home, were told that he was not, heard a sound within, and rushed into the apartment. Dorman was not there but a man friend of his mother's, who lived in the apartment with her, was. He was watching television, apparently dressed only in a pair of shorts.

The police then thoroughly searched the apartment. One policeman entered a walk-in closet where he found an unhemmed suit from the clothing store. The policeman removed that suit, and half a dozen others which belonged to Mrs. Dorman's friend. Other policemen, as Judge Gasch who heard testimony at a suppression hearing found, "rummaged about the apartment and seized other items which have since been returned" to Dorman. Finding that Dorman was not at home, the police nevertheless stayed in the apartment until 4:00 the next morning, passing the time, according to Mrs. Dorman, "smoking cigarettes and laughing." Mrs. Dorman

2. Appellant left copies of his monthly probation report showing his name and address at the scene of the crime. In addition, he was identified as one of the robbers by at least three eye witnesses.

and her friend discussed trying to find a place to stay during the night since the police seemed intent on remaining. The next day the police apprehended Dorman as he was riding in a car. At trial the Government introduced into evidence, over defense counsel's objection, the suit taken from the closet.

The Government here contends that the police had probable cause to arrest Dorman; that it was reasonable to believe he might be at his home; that the police entrance into the home without a warrant to look for him was reasonable; that, although Dorman was eventually discovered not to be at the apartment, it was reasonable for the police to look into the closet to see if he was hiding there; and that since the suit was in the plain view of the officer once he looked into the closet the suit was validly seized as being within the proper scope of a lawful search for a suspected felon. I agree with the Government that the actions of the police in this case should be judged from their position at the time they came to, and entered, Dorman's apartment with the intent of finding and arresting him. Further, I agree that at that time the police had probable cause to arrest Dorman. Finally, I agree that it was reasonable for the police to believe that Dorman might have been at his home. The question then becomes whether, nonetheless, the police violated the Fourth Amendment when they entered Dorman's home without a warrant.

Both the Supreme Court and this court have made clear on numerous occasions that, when police enter a home to search for a person or for evidence or fruits of crime, the preferred method of proceeding is to obtain a warrant.[3] Mr. Justice Jackson, a distinguished prosecutor before becoming a Justice, expressed it well:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies

3. See, e.g., Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Katz v. United States, 389 U.S. 347, 356–357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); United States v. Ventresca, 380 U.S. 102, 105–106, 85 S.Ct. 741, 13 L.Ed. 2d 684 (1965); Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Aguilar v. Texas, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Preston v. United States, 376 U.S. 364, 367–368, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Wong Sun v. United States, 371 U.S. 471, 481–482, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963); Chapman v. United States, 365 U.S. 610, 614–617, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); Jones v. United States, 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); Giordenello v. United States, 357 U.S. 480, 486, 78 S. Ct. 1245, 2 L.Ed.2d 1503 (1958); United States v. Jeffers, 342 U.S. 48, 51, 72 S. Ct. 93, 96 L.Ed. 59 (1951); McDonald v. United States, 335 U.S. 451, 454–456, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Trupiano v. United States, 334 U.S. 699, 705, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); United States v. Lefkowitz, 285 U.S. 452, 464, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Chappell v. United States, 119 U.S.App. D.C. 356, 359–360, 342 F.2d 935, 938–939 (1965); Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958); Accarino v. United States, 85 U.S.App. D.C. 394, 179 F.2d 456 (1949).

The concern of the courts has been expressed forcefully. In McDonald v. United States, supra, 335 U.S. at 456, 69 S. Ct. at 193, the Supreme Court said:

"* * * Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. * * *"

I note a renewed concern today in the face of figures which indicate that the Fourth Amendment warrant requirement is not being respected by the police. Thus in the city of San Francisco there were only 19 search warrants issued in 1966 and only 20 in 1967. Letter from Fred Graham, New York Times Reporter, to Professor Telford Taylor, School of Law, Columbia University, December 20, 1968, reporting on figures obtained from Harry Green, Chief Division Clerk, Criminal Division, San Francisco Municipal Court.

law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * * The right of officers to thrust themselves into a home is * * * a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). (Footnotes omitted.)

These considerations have resulted in the requirement that when police enter a house to search for and arrest a person they must have a warrant unless "exigent circumstances" require their immediate entry. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948). This court stated the requirement quite explicitly as long ago as 1949. In Accarino v. United States, 85 U.S.App.D.C. 394, 179 F.2d 456 (1949), we discussed the right of privacy which underlies the Fourth Amendment. We noted that a person has an additional right of privacy in his home. We went on to say:

"* * * That additional right imposes additional requirements upon the power of arrest. In District of Columbia v. Little, [85 U.S.App.D.C. 242, 178 F.2d 13 (1949), affirmed on other grounds, 339 U.S. 1, 70 S.Ct.

468, 94 L.Ed. 599 (1950)], we said: 'We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate.'"

85 U.S.App.D.C. at 402, 179 F.2d at 464. We have since recognized a number of times the requirement that the police must be faced with exigent circumstances, sometimes called necessitous circumstances, before they can enter a home to make an arrest without a warrant. See, e. g., Chappell v. United States, 119 U.S.App.D.C. 356, 360, 342 F.2d 935, 939 (1965); Jackson v. United States, 112 U.S.App.D.C. 260, 302 F.2d 194 (1962); Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958).

"Exigent circumstances" means something more than probable cause to believe a person has committed a crime and reasonable grounds to believe he is within his home.[4] The Supreme Court has listed some exigent circumstances. These include a suspect fleeing or likely to flee the jurisdiction, evidence, weapons or contraband threatened with removal or immediate destruction, or a case where "the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name of the law." McDonald v. United States, supra, 335 U.S. at 454, 69 S.Ct. at 192; Johnson v. United States, supra, 333 U.S. at 14–15, 68 S.Ct. 367.

Most recently, in Warden, Maryland Penitentiary v. Hayden, supra, the Court expanded the meaning of exigent circumstances to include a situation of "hot pursuit." In Hayden there was an armed robbery; two cab drivers came

---

4. Compare Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925):

"* * * Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause. * * *"

on the scene and followed the robber to a house. The cab drivers notified the police by radio and the police arrived at the house within five minutes. They entered the house to look for the robber, found him there, and arrested him. The Court held that under those circumstances a warrant was not necessary.

At the suppression hearing here the Government tried to justify the police entry as an extension of the principle laid out in *Hayden*.[5] The District Judge, somewhat reluctantly, agreed. He ruled:

> " * * * [I]t appears to this Court that the entry, search and seizure in this case should be upheld as a reasonable exercise of police authority, following the reasoning of Warden v. Hayden, *supra*. Once the police found papers identifying defendant Dorman at the scene of the crime, and showing his address, the police had probable cause to believe that he would have gone home following the robbery, and that he might still be there. They knew he was armed and that he was not unwilling to use force and violence to accomplish his aims. They had a duty to try to apprehend him as quickly as possible. * * * "

However, this case does not present hot pursuit as in *Hayden*. Here there was a four-hour delay between the crime and the entry. In *Hayden* the whole episode took but a few minutes. This difference in time between the two cases undercuts the application of the hot pursuit exception to this case. In the four hours any

fruits of the crime that the suspected robber intended to dispose of immediately would no longer be in his custody; similarly, if the suspect was in fear of being caught or felt he was being pursued, it was not likely that he would linger at his home for four hours prior to fleeing. Also, if he intended to get rid of any possible weapons, the time was ample for him to have already done so. Thus the primary rationale for the *Hayden* hot pursuit exception is absent here.

The police, while waiting for a judicial officer to authorize entry into the home, could simply have staked out the apartment. In fact, while the group of officers entered, others did cover the exits to the building and apartment. The police could have remained outside the apartment until a warrant was obtained. If Dorman was in the apartment and left it, the police could have arrested him then. The difference in approach is not slight. Had the police followed this procedure, Mrs. Dorman and her friend might have been spared the shame, shock and embarrassment of the nighttime shotgun-bearing entrance of half a dozen policemen into their home. Further, the insensitive action of the group remaining inside the home through most of the night might have been avoided. This is so because, even if the magistrate or judge had decided that probable cause existed to issue a warrant, he might have put reasonable limits on its execution—for example, he might have limited the entry of a home in its execution to daytime,[6] or he might

---

5. In the District Court the Government also tried to justify the entry on the ground of consent, since Mrs. Dorman had told the police they could enter. Judge Gasch quite properly rejected this argument:

> "The consent theory can be disposed of quickly, for no valid consent can be found when police armed with shotguns present themselves at the door of a house or apartment late at night and state that they want to arrest the householder's son. * * * "

6. Rule 41(c), Fed.R.Crim.P., directs that search warrants can be served only in the

daytime, unless the affidavits are positive that the property is in the house, in which case the judge or commissioner has discretion to authorize a nighttime search. Rule 4, Fed.R.Crim.P., dealing with arrest warrants, is silent on this subject, but no reason appears why the judge or commissioner cannot put reasonable limits on its execution, at least where the police state that they intend to enter a home to effectuate the arrest. As Rule 41 shows, entry at nighttime is viewed more gravely than a daytime entry, so the time of execution is clearly a consideration that the judge or commissioner can take into account. As noted,

have made explicit that the warrant was good only to search for Dorman and that it was not a license to remain indefinitely in the apartment.[7]

A final point should be made regarding the advice of the Assistant United States Attorney to the police that a judge could not be found so the police should make the arrest without a warrant. First, the attorney was called when Detective Blancato began typing an application for a warrant, and he called back with his advice before Detective Blancato had finished typing it. The time elapsed was thus very short. It is hardly credible that a diligent search for a judge or magistrate was made within that time.[8] This court has noted several times that magistrates are available 24 hours a day. Ricks v. United States, 118 U.S.App.D.C. 216, 221, n. 11, 334 F.2d 964, 969, n. 11 (1964); Jones v. United States, 113 U.S.App.D.C. 256, 258, 307 F.2d 397, 399 (1962). And if the magistrate on duty was somehow unavailable, there were, as the Government concedes, over 125 other judicial officers in the District authorized to issue warrants.

In my judgment the police were right in seeking a warrant before they entered and searched this home. I join the majority here in hoping they will do so again when confronted with a similar situation.

the facts in this case speak eloquently for the placing of reasonable limitations on the execution of warrants. 11 D.C. Code § 981 (1967), authorizing judges of the Court of General Sessions to issue warrants, is also silent on the subject of limitations to be placed on execution. Similarly, no reason appears why the judges of that court cannot exercise discretion to place reasonable limits on the execution of the warrant.

7. Broad policy considerations not unlike the ones raised by this case may have been in the minds of the Framers when they wrote into the Constitution, as the third part of the Bill of Rights:

"No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner * * *."

8. A wide variety of persons have power to issue arrest warrants. 11 D.C. Code § 981 empowers any judge of the Court of General Sessions to issue warrants. In fact, that statute quite explicitly envisions the judges being called upon at unusual times to exercise this important function:

"Each judge of the District of Columbia Court of General Sessions may, *at any time, including Sundays and legal holidays,* * * *." (Emphasis added.)