UNITED STATES, Appellant,

v.

Mark B. HARRIS, Appellee.

No. 93–CO–102.

District of Columbia Court of Appeals.

Argued June 9, 1993.

Decided July 29, 1993.

Elizabeth H. Danello, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Oscar S. Mayers, Jr., Asst. U.S. Attys., were on the brief, for appellant.

Frederick J. Sullivan, appointed by this court, for appellee.

Before FERREN, STEADMAN and FARRELL, Associate Judges.

FERREN, Associate Judge:

▇ In this expedited interlocutory government appeal, we review a trial court order suppressing evidence that police discovered on the defendant's person and in his bedroom after they had entered his home, without a warrant, to arrest him for murder.[1] Because we believe that the police were acting under exigent circumstances, including a serious danger that the defendant would attack again if not apprehended as quickly as possible, we conclude that the warrantless entry to arrest him was lawful. Consequently, the ammunition clip that police found when they searched the defendant, incident to that arrest, was lawfully obtained. Furthermore, we conclude under *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), that the police were entitled to make a cursory search of defendant's bedroom as part of a limited protective sweep incident to defendant's arrest. Because the police found the remaining evidence at issue—two guns and a second ammunition clip—in plain view during this lawful search, we conclude that this evidence was also lawfully seized. Accordingly, we reverse the motions judge's suppression order and remand this case for further proceedings.

## I. THE SUPPRESSION HEARING

On the basis of evidence linking the defendant-appellee, Mark B. Harris, with a random shooting, a grand jury charged Harris with the following offenses: first-degree, premeditated murder while armed, D.C.Code §§ 22–2401, –3202 (1989 Repl. & 1992 Supp.); assault with a dangerous weapon, D.C.Code § 22–502 (1989 Repl.); possession of a firearm during a crime of violence, D.C.Code § 22–3204(b) (1992 Supp.); two counts of destruction of property D.C.Code § 22–403 (1989 Repl.); carrying a pistol without a license (D.C.Code § 22–3204(a)) (1992 Supp.); possession of an unregistered firearm, D.C.Code § 6–2311(a) (1989 Repl.); and possession of unregistered ammunition, D.C.Code § 6–2361(3) (1989 Repl.). Before trial, Harris moved to suppress physical evidence, including the 9–mm pistol believed to be the murder weapon, which the police seized in Harris's apartment incident to his arrest.

At the January 4, 1993, hearing on this motion, Detective Jerome Sitek testified that on November 15, 1991, he had been called to investigate a homicide at 1319 Park Road, N.W. He arrived on the scene at about 6:30 or 6:35 p.m. and remained there for approximately one hour to one hour and fifteen minutes. According to Detective Sitek, witnesses at the scene said that at about 6:15 p.m. a man had accused people on the block of stealing his bicycle and had threatened to "shoot up all of Park Road" until he got the bicycle back. The man brandished what witnesses believed to be a 9–mm handgun and then began to fire

---

1. This court has jurisdiction to hear interlocutory government appeals of pretrial suppression orders pursuant to D.C.Code §§ 11–721(a)(3) & 23–104(a)(1) (1989 Repl.). We note that, before filing this appeal, the government also filed a motion for reconsideration with the trial court, on which the trial court has not yet ruled—apparently because this appeal was taken soon thereafter. In a criminal case, a motion for reconsideration does not terminate the time for filing an appeal. *See* D.C.App.R. 4(b)(2); *Taylor v. United States*, 603 A.2d 451, 458–59 (D.C.), *cert. denied*, — U.S. —, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992); *Beale v. United States*, 465 A.2d 796, 798 n. 1 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *In re Alexander*, 428 A.2d 812, 814–15 (D.C. 1981), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1014, 71 L.Ed.2d 303 (1982). Consequently, in the criminal context a motion for reconsideration is not an obstacle to appellate jurisdiction. This court's rule that a motion for reconsideration does not toll the time for filing a criminal appeal is contrary to federal practice. *See United States v. Ibarra*, — U.S. —, 112 S.Ct. 4, 116 L.Ed.2d 1 (1991). Although federal court interpretation of federal procedural rules commonly informs this court's interpretation of its similar rules, we have also made clear that a federal interpretation is not binding on this court's interpretation of its own rules. *See West v. United States*, 346 A.2d 504, 506 (D.C.1975). In light of the Supreme Court's recent *Ibarra* decision, however, we believe this court should reconsider its "no tolling" rule.

randomly into passing vehicles on Park Road. Next, he walked over to Rene Best, who was seated on the front step of 1319 Park Road, and fired two rounds at Best, striking and killing him. This was an unusual shooting, Sitek said, because Best "offered no resistance"; Best "was a neighborhood alcoholic who bothered absolutely nobody and could not flee the scene that day because he was intoxicated and may have been passed out from his intoxicated level." After the shooting, the shooter continued to make threats as he left the scene, heading south on 13th Street, N.W.

Two of the witnesses identified the shooter as "Mario." Eventually, that same evening, Detective Sitek learned that "Mario" might possibly be the defendant, Mark Harris, although Sitek was unable to say how he came by this information. Sitek did not believe that this information was sufficient to justify Harris's arrest. Later that evening, however, police were contacted by another witness who had been standing next to Best when Best had been shot, and Sitek arranged to meet this witness. Sometime between 2:45 a.m. and 3:00 a.m. on the morning of November 16, 1991, this witness picked out Harris's photo from a nine-photo array and positively identified him as the shooter. At that point, Sitek believed he had probable cause to arrest Harris.

Sitek obtained Harris's address—1372 Kenyon Street, N.W.—from the police computer. Sitek then decided to go directly to 1372 Kenyon Street to arrest Harris, without first obtaining a warrant. Although Sitek could not be sure that Harris would be at home, Sitek thought that he might find Harris there at that time of the morning. Sitek testified that he did not take the time to seek a warrant, which could have taken between one and three hours to accomplish, because he felt that it was important to apprehend Harris as soon as possible. In particular, Sitek cited the violence of the crime, the witness's positive identification of Harris as the shooter, the fact that the shooting had been unprovoked, the shooter's general threats against the Park Road residents, and his belief that Harris was still armed and in the area, as contributing factors in this decision.

It took Sitek until 3:30 or 3:45 a.m. to assemble an arrest team of ten to twelve police officers. The team arrived at 1372 Kenyon at about 3:50 or 3:55 a.m. Some of the officers went to the back of the building to guard the rear window of Harris's apartment. According to Sitek, the remaining officers proceeded to the locked front door of the building, buzzed someone to gain entry, identified themselves as police officers, and were admitted.[2] They then went to Harris's apartment, number 101, and knocked. Harris's mother opened the door. The officers identified themselves and asked to speak with Harris. Harris's mother answered that he was in back, in his room; she pointed to the rear of the apartment. The officers then entered the apartment and walked down an L-shaped hallway toward Harris's bedroom. Partway down the hall, they encountered Harris as he was leaving his bedroom. Sitek announced, "We're police officers, freeze," and pointed his weapon at Harris. The officers then arrested Harris.

Thereafter, Sitek and another officer, Officer Bailey, went into Harris's bedroom to make sure that no one else was there. Sitek admitted that he did not have any information indicating that there might be anyone else in that bedroom who might pose a danger to the police. Nevertheless, the police decided to "check out" the bedroom for their own safety. In order to do so, Sitek said, the police actually had to enter the bedroom, because it contained a blind corner and a closet. Once inside the bedroom, Sitek saw an ammunition clip on a bookshelf. When Sitek went to the far side of the bed to make sure that no one was hiding between the bed and the wall, he also noticed a weapon next to the bed. Sitek did not remove these items; instead,

2. There was conflicting testimony as to exactly how the officers gained entry into the building lobby. Officer Bailey testified that the police entered as someone else was leaving. Officer Michaels testified that the police had gained entry either by calling a tenant from an outside phone or by jimmying the door.

Sitek left an officer posted to secure the room, while he went to obtain an emergency search warrant. While Sitek was preparing the warrant papers, however, he received a call informing him that Harris had consented to a search.

Officer Gregory Bailey and Lieutenant Philip Michaels essentially corroborated Sitek's testimony concerning the events at Harris's apartment. Bailey testified that he had heard a "thump" coming from the bedroom, which he believed might be the sound of Harris dropping a gun on the floor, just before Harris emerged from the bedroom. Bailey told Harris to come out, and Harris did so. Bailey then had Harris put his hands on the hallway wall. Bailey quickly frisked Harris and felt what he thought was a pistol magazine in Harris's pocket. After telling Lieutenant Michaels about the magazine, Bailey turned Harris over to Michaels. Bailey then went into Harris's bedroom, turned on the light, and searched the bedroom to make sure no one else was in there. Inside the bedroom, Bailey saw an ammunition clip on the shelves and two weapons in plain view between the bed and the wall next to the bed, a 9–mm pistol and a "Tec–9" semiautomatic pistol. Shortly thereafter, Detective Sitek entered.

Lieutenant Michaels testified that another officer had found an ammunition magazine in the defendant's pocket while the two were patting Harris down in the hall outside of the bedroom. Lieutenant Michaels handcuffed Harris and then, within about a minute, escorted him outside the apartment into the building's hallway. There, apparently after the initial sweep of Harris's bedroom had already taken place, Michaels obtained Harris's consent to search the apartment. The government introduced a preprinted form, signed by Harris and countersigned by Michaels, which informed Harris of his right to withhold consent to a search and authorized police to search the entire apartment. According to Michaels, Harris signed the form a little after 4:00 a.m.

Dovie Dozier, Harris's mother, testified for the defense. She said that at about 4:00 a.m. she heard a knock on the door and the announcement "Police. Open up." When she did so, she saw the police with guns pointing at the door. She admitted that she had not sought to refuse police entry and that she had told them that Harris was inside. She testified, however, that the police never requested permission to enter or search the apartment and that she had never voluntarily granted consent to the entry or search.

Harris himself testified that he had been awakened by the knock at the door. He heard his mother say the police were at the door, so he got up and left his room to investigate. He met the police in the hall leading to his bedroom. Harris further testified that a police officer who said he had found a clip in Harris's pocket struck Harris on the head with it. Harris also testified that he had signed the consent form because the police had told him they had already found what they had come looking for.

Harris's sister, Brenda Harris, also testified. She said that she had seen the search of her brother's room, that her brother's bed was located "against the wall," and that she had seen a detective reach behind her brother's bed to retrieve a gun.

At the conclusion of the hearing, the motions judge ordered suppression of all evidence obtained from Harris's apartment, including evidence seized from Harris's person as well as from his bedroom. The judge concluded that the officers had probable cause to arrest Harris.[3] Because the police did not seek a warrant, however, the judge determined that their entry both into the common hallway of the apartment building[4] and then into Harris's apartment

---

**3.** The motions judge did not explicitly indicate at what point in their investigation the police had probable cause, but the context of the discussion suggests that the judge meant there was probable cause before the police entered the apartment building.

**4.** The motions judge concluded, as a preliminary matter, that Harris had a legitimate expectation of privacy in the common hallway of the apartment building.

was presumptively illegal unless permitted by consent or justified by exigent circumstances. With regard to the consent issue, the judge concluded that: (1) because of the conflicting testimony about how the police entered the apartment building, *see supra* note 2, the government had failed to establish that the police had entered the building with consent; (2) the police entry into Harris's apartment had been coerced; (3) even if the entry into the apartment had not been coerced, the police nonetheless lacked any basis for entering Harris's bedroom; and (4) the consent form signed by Harris did not validate the search that had already taken place. The motions judge also concluded that the government had failed to show exigent circumstances sufficient to justify entry into either the building or the apartment. In reaching this ruling, however, the motions judge did not expressly apply all the relevant criteria, as set forth in our caselaw, for determining when there are exigent circumstances. The only findings on that issue were that the entry had been made ten hours after the offense and without any information showing that Harris would be at home.

On appeal, the government does not contest the motions judge's ruling that the police entered Harris's apartment without consent. Nor does it argue that Harris consented to the search of his bedroom. The government contends, however, that (1) the warrantless entry to arrest Harris was lawful because of the exigent circumstances of the case and that (2) once inside the apartment, the police were entitled to search Harris's bedroom as part of the arrest procedure. The government also argues that Harris did not have a legitimate expectation of privacy in the building's common hallway.

## II. THE WARRANTLESS ENTRY AND THE EXIGENT CIRCUMSTANCES EXCEPTION

### A.

■ Warrantless, nonconsensual searches or seizures within the home are presumptively unreasonable under the Fourth Amendment. *See, e.g., Derrington v. United States*, 488 A.2d 1314, 1322 (D.C. 1985) (citing *Payton v. New York*, 445 U.S. 573, 586, 588–89, 100 S.Ct. 1371, 1380, 1381, 63 L.Ed.2d 639 (1980)), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). A warrantless, nonconsensual entry into the home to make an arrest may be justified, however, where there are "exigent circumstances." *See, e.g., Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990); *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *Payton*, 445 U.S. at 588–590, 100 S.Ct. at 1381–82; *Derrington*, 488 A.2d at 1323; *United States v. Minick*, 455 A.2d 874, 876 (D.C.) (en banc), *cert. denied*, 464 U.S. 831, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983); *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc).

■ The Supreme Court has not attempted a comprehensive definition of the exigent circumstances exception to the warrant requirement. The leading cases in which the Court has upheld warrantless, nonconsensual entries into the home to make an arrest remain *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976), and *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967). In both of these cases, police were in "hot pursuit" of suspects whom they had probable cause to arrest.[5] But the Court has

---

5. The phrase "hot pursuit" first appeared in *Johnson v. United States*, 333 U.S. 10, 16 n. 7, 68 S.Ct. 367, 370 n. 7, 92 L.Ed. 436 (1948). *See Santana*, 427 U.S. at 43 n. 3, 96 S.Ct. at 2410 n. 3. To qualify as "hot pursuit," a warrantless entry must involve "immediate or continuous pursuit of the [suspect] from the scene of a crime," *Welsh*, 466 U.S. at 753, 104 S.Ct. at 2099, although "an extended hue and cry in and about the public streets" is not required, *Santana*, 427

U.S. at 43, 96 S.Ct. at 2410 (internal quotation marks and brackets omitted).

In *Hayden*, police responding to the scene of an armed robbery entered a house where the robber was reported to have taken refuge. In his opinion for the Court in *Hayden*, Justice Brennan did not actually use the phrase "hot pursuit" to describe the police action; rather, he referred to "'the exigencies of the situation.'" 387 U.S. at 298, 87 S.Ct. at 1645 (quoting *Mc-*

intimated that exigent circumstances may exist even where police are not in hot pursuit of the suspect, and we, along with numerous other jurisdictions, have so held.[6] In *Minick*, for instance, we concluded that exigent circumstances sufficient to justify a warrantless entry still existed some four-and-a-half hours after a rape, owing to the need to preserve evanescent evidence of the crime. *See id.*, 455 A.2d at 876, 880–82. And in *Derrington*, we held that a delay as long as twenty-six-and-a-half hours between the crime and the warrantless entry did not necessarily negate the existence of exigent circumstances. *See id.*, 488 A.2d at 1321, 1323–24.

In *Minick*, *Derrington*, and other cases involving the exigent circumstances exception, we have followed the approach laid out in the en banc opinion of the United States Court of Appeals for the District of Columbia Circuit in *Dorman*. In concluding that exigent circumstances justified a warrantless entry to apprehend an armed robbery suspect approximately four hours after the crime, the *Dorman* court considered seven different factors. As later summarized in *United States v. Lindsay*, 165

U.S.App. D.C. 105, 110, 506 F.2d 166, 171 (1974), the *Dorman* criteria are:

(1) That a grave offense is involved, particularly a crime of violence;

(2) the suspect is reasonably believed to be armed;

(3) a clear showing of probable cause;

(4) a strong reason to believe that the suspect is in the dwelling;

(5) the likelihood of escape if not swiftly apprehended;

(6) a peaceful entry as opposed to a "breaking"; and

(7) the time of entry (night or day).

*See also Minick*, 455 A.2d at 876. Not all of the *Dorman* factors need be present in a given case to justify a warrantless entry. *See Gaulmon v. United States*, 465 A.2d 847, 850 (D.C.1983). Rather, we evaluate the degree of exigency according to the totality of the circumstances. *See State v. Lloyd*, 61 Haw. 505, 606 P.2d 913, 918 (1980) *and Commonwealth v. Forde*, 367 Mass. 798, 329 N.E.2d 717, 720 (1975), *cited in Gaulmon*, 465 A.2d at 850; *see also Lindsay*, 165 U.S.App.D.C. at 111, 506 F.2d at 172. "The very term 'exigency' commands that analysis be shaped by the reali-

---

Donald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)). In a concurring opinion in *Hayden*, however, Justice Fortas characterized the case as one involving "hot pursuit," 387 U.S. at 310, 87 S.Ct. at 1652, and *Hayden* is commonly cited as a hot pursuit case, notwithstanding the fact that the *Santana* court observed that *Hayden* did not "involve a 'hot pursuit' in the sense that that term would normally be understood," *Santana*, 427 U.S. at 43 n. 3, 96 S.Ct. at 2410 n. 3, perhaps because police did not literally see the suspect enter the house where they found him, relying instead on witness reports.

In *Santana*, police were chasing a woman from whom they had just made a drug purchase through an intermediary. They initially saw her standing on the threshold of her house and she retreated inside to escape them. The Court upheld the ensuing arrest and search inside the home on the ground that police were in "hot pursuit" and that delay would result in the loss of evidence. 427 U.S. at 43, 96 S.Ct. at 2410.

6. In *Hayden*, the Court said that the "Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." 387 U.S. at 298–99, 87 S.Ct. at

1645–46. Courts interpreting *Hayden* have understood this language to mean that exigent circumstances, *e.g.*, danger to police or others, may excuse a warrantless entry to make an arrest even where there is no hot pursuit. *See Dorman*, 140 U.S.App.D.C. at 319–20, 435 F.2d at 391–92.

More recently, in *Olson*, the Supreme Court reviewed the legality of a warrantless entry and arrest that had taken place in connection with an armed robbery and murder. In that case there had been a thirty-three hour delay between the crime and the arrest. *See Olson*, 495 U.S. at 93–94, 110 S.Ct. at 1686–87. While the Court agreed with the Minnesota Supreme Court that the entry was not justified by exigent circumstances, neither court suggested that the obvious lack of hot pursuit, by itself, was sufficient to negate such a claim. *Id.* at 100–01, 110 S.Ct. at 1690.

For general discussion of the outlines of the exigent circumstances doctrine as applied in the lower courts, see Thomas L. LaMacchia *et al.*, *Twenty–Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991–92*, 81 GEORGETOWN L.J. 853, 902–10 (1993); 2 WAYNE R. LAFAVE, SEARCH & SEIZURE § 6.1(f) (1987 & 1993 Supp.).

ties of the situation presented by the record." [7] *Gaulmon,* 465 A.2d at 850 (quoting *United States v. (Vance) Robinson,* 174 U.S.App.D.C. 351, 354, 533 F.2d 578, 581 (1975) (en banc), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976)) (internal quotation marks and brackets omitted).

■ Furthermore, the fact that exigent circumstances may exist at some point during the investigation of a crime will not necessarily justify a warrantless entry if there is a period of unnecessary delay during which the exigency evaporates or the police might have obtained a warrant. *See Minick,* 455 A.2d at 881 & nn. 11 & 12. Thus, in cases such as this, where a substantial period of time has elapsed between the commission of the crime and the warrantless entry, we have supplemented the *Dorman* criteria with the following questions concerning the timing of the entry within the context of the investigation as a whole:

(1) At what time did the police decide they had sufficient cause to pursue [the suspect]?

(2) Did the police act reasonably in waiting that long to do so?

(3) By the time the police were ready to move against [the suspect], were there exigent circumstances justifying a warrantless entry under *Dorman* ...?

(4) If so, did the police enter the premises without unreasonable delay?

*Minick,* 455 A.2d at 876; *see also Derrington,* 488 A.2d at 1323–24.

■ In reviewing the trial court's suppression order, we are bound to accept the court's factual findings, absent clear error. *See, e.g., Derrington,* 488 A.2d at 1323; *Minick,* 455 A.2d at 876. However, "[a]ppellate deference to the trial court is limited in this context to findings of fact." *Minick,* 455 A.2d at 880 n. 6 (citing *Brooks v. United States,* 367 A.2d 1297, 1302 (D.C. 1976)); *see also United States v. Booth,* 455 A.2d 1351, 1355 n. 5 (D.C.1983). Where the essential facts are not in dis-

pute, the ultimate determination as to whether exigent circumstances justified a warrantless entry remains a conclusion of law, which we decide *de novo. See United States v. Socey,* 269 U.S.App.D.C. 453, 459, 846 F.2d 1439, 1445, *cert. denied,* 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); *(Vance) Robinson,* 174 U.S.App.D.C. at 353, 533 F.2d at 580.

### B.

■ We begin our analysis with the first two questions set forth in *Minick:* "At what time did the police decide they had sufficient cause to pursue the defendant?" and "Did the police act reasonably in waiting that long to do so?"

In this case, the trial court did not make any finding as to when the police decided that they had sufficient cause to pursue Harris. However, the record quite clearly indicates that Detective Sitek believed he did not have probable cause to arrest Harris until after one witness had picked out Harris's photo from a photo array, *i.e.,* between 2:45 a.m. and 3:00 a.m. on the morning of November 16, 1991. Sitek testified that, before midnight of November 15, he had obtained information that the "Mario" named by witnesses as the shooter was Mark Harris. While this information was enough to make Harris a suspect, Sitek did not believe that it provided an adequate ground for arresting Harris. Only after one witness had made a positive identification of Harris from the photo array did Sitek assemble an arrest team.

We see nothing unreasonable in Sitek's decision not to pursue Harris before obtaining this visual identification. Up until that point, the only evidence linking Harris to the shooting was a mere match of names. Sitek's prudence in waiting to obtain more substantial evidence before attempting an arrest was, if anything, commendable. *See Minick,* 455 A.2d at 877 ("an approach that forces the police to seek a warrant as soon

---

7. We recognize that the *Dorman* test has been criticized as being too complex for officers in the field to follow. *See* 2 LaFave, *supra* note 6, § 6.1(f) at 599–600. We have never suggested, however, that the *Dorman* criteria should be applied as a rigid checklist, whether by officers in the field or by judges reviewing police actions.

as they arguably have probable cause may result in premature police intrusions upon individual privacy").

## C.

■ We turn now to the third—indeed, the central—question posed by *Minick:* whether, applying the seven *Dorman* criteria, there were exigent circumstances sufficient to excuse the failure to seek a warrant at the time the police decided to move against Harris, *i.e.,* between 2:45 and 3:00 a.m. In answering this question, we assume for the sake of argument that Harris had standing to contest the initial entry through the building's locked front door into the apartment building's common hallway [8]—an entry not based in any way on the information Harris's mother later supplied that he was in the apartment. Consequently, we focus our attention on the circumstances of this initial entry, in contrast with the subsequent entry into Harris's apartment after Dovie Dozier had told the police her son was there. On review of all the *Dorman* criteria, we conclude that exigent circumstances fully justified the initial entry into the building's common hallway and, thereafter, into Harris's apartment.

In the first place, our overriding concern in reaching this conclusion is the gravity of the offense and what that offense indicated about the character of the shooter and the danger that he posed to the community. *See Brooks,* 367 A.2d at 1302 ("community security is the basic concern underlying this criterion"). This was an exceptional case. The killing was not committed in the course of a robbery or a drug deal gone bad, nor was it prompted by jealousy or revenge. The evidence showed that the shooter had chosen a defenseless victim entirely at random and that the only motivation for the killing was that "someone" had stolen the shooter's bicycle. Furthermore, both before and after the killing the shooter had threatened to "shoot up all of Park Road until he got his bicycle back." Both the killing and the random shots at passing cars made it clear that this threat, however extravagant, was all too real. Thus, the police had reason to believe that they were dealing not just with a murderer, but with a mentally unbalanced individual whose actions would be difficult to predict and who might well kill again if not apprehended.[9] Indeed, given the particular irra-

---

8. Citing caselaw from other jurisdictions, the government urges us to hold that Harris did not have a legitimate expectation of privacy in the apartment building's common hallway and therefore lacks standing to contest the police entry into that area. *See, e.g., United States v. Acosta,* 965 F.2d 1248, 1251–53 (3d Cir.1992); *United States v. Concepcion,* 942 F.2d 1170, 1172 (7th Cir.1991); *United States v. Holland,* 755 F.2d 253, 255 (2d Cir.), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985). *But see United States v. Fluker,* 543 F.2d 709, 715–17 (9th Cir.1976); *United States v. Carriger,* 541 F.2d 545, 549, 552 (6th Cir.1976). We have not previously decided this precise issue. In *Bryant v. United States,* 599 A.2d 1107, 1109–1110 (D.C. 1991), and *Booth,* 455 A.2d at 1353–54, we held that a resident of a rooming house has a legitimate expectation of privacy in the house's common areas. But we left open the question whether a tenant would have a similar expectation of privacy in the common areas of "a large multi-unit apartment building." *Bryant,* 599 A.2d at 1110 n. 4. More recently, in *Brown v. United States,* 627 A.2d 499, 503–504 & n. 5 (D.C.1993), we held that a defendant did not have standing to challenge a police entry into the common hallway of an apartment building, but the defendant in that case was neither a resident of the building nor a guest of a resi-

dent, and the door of the building had been propped open. In any event, we need not decide whether Harris had a legitimate expectation of privacy in the building's common hallway, given our conclusion that in any case exigent circumstances justified even the initial entry into that hallway.

9. We note that in another exigent circumstances case somewhat similar to this, the United States Court of Appeals for the Eighth Circuit gave great weight to the need to protect the public where there was evidence that the suspect had fired at random down a public street, "an inherently alarming and dangerous situation requiring a quick investigative response from police." *See United States v. Jones,* 635 F.2d 1357, 1361 (8th Cir.1980). Also, at least one other court has held that exigent circumstances existed where a murder suspect posed an imminent threat of bodily harm to another individual. *See Randolph v. State,* 463 So.2d 186, 190–91 (Fla.1984) (exigent circumstances justified warrantless entry and arrest, where murder witness who had been seen by alleged murderer feared she would be killed by murderer if he was left at large), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985).

More generally, the situation faced by the police in this case is roughly comparable to the

tionality of the earlier killing, police would have had some basis for fearing that Harris might fire on them or others in order to resist arrest.[10]

Second, continuing through the *Dorman* factors, we note that police had reason to believe that Harris was still armed. While they had no direct evidence that Harris still had a weapon when they decided to undertake the warrantless arrest operation, the police knew that the shooter had been seen brandishing a 9–mm pistol and that no weapon had been recovered from the murder scene. This information was sufficient for them reasonably to conclude that Harris had a gun. *Cf. Dorman,* 140 U.S.App. D.C. at 321, 435 F.2d at 393 (conclusion that exigent circumstances existed took into account fact that appellant armed while committing crime).

Third, the evidence fully supports the motions judge's conclusion that the police had probable cause to make the arrest. One witness had picked out Harris's photo as that of the shooter, and two others had said the shooter was "Mario," Harris's apparent nickname.

Fourth, while the police did not have any direct proof that Harris was on the premises when they first entered the building, they did know that Harris lived at that address, and the early morning hour suggested that he might likely be asleep there.[11] *See id.* ("concepts of probable cause and reasonableness prima facie justi-

fy looking for a man at home after 10 p.m.").

Fifth, there was no particular evidence that Harris was likely to escape. Indeed, the record shows that once police arrived on the scene, they covered the rear windows to the apartment, thereby reducing the possibility of any escape. Under the circumstances, however, police also had a strong interest in discovering as soon as possible whether Harris was in fact on the premises, for if he was not, they would have had to search for him elsewhere to ensure the protection of the residents of Park Road. Merely surrounding the building and waiting to see whether Harris eventually emerged was not a workable alternative. Indeed, the fact that the police, in covering all exits, could presumably prevent Harris's escape would not protect residents *inside* the building from Harris's random shooting. Furthermore, we have often considered under this heading the related danger that evidence of the crime might be hidden or destroyed. *See Derrington,* 488 A.2d at 1324; *Minick,* 455 A.2d at 878, 880–81; *Brooks,* 367 A.2d at 1303. In this case, the longer the police waited, the more likely it was that the suspect would dispose of the murder weapon. "Exigency is heightened where the evidence about to be removed is a gun used to kill." *Derrington,* 488 A.2d at 1324.

Sixth, there was conflicting testimony as to whether the initial entry into the building had been forced or not, *see supra* note

kind of "emergency" situation that we have also recognized as permitting a warrantless entry, where there is evidence that a person within the premises is in imminent danger of bodily harm. *See Earle v. United States,* 612 A.2d 1258, 1263–64 (D.C.1992); *Clark v. United States,* 593 A.2d 186, 196–97 (D.C.1991); *Booth,* 455 A.2d at 1355–56.

**10.** *Cf. Llaguno v. Mingey,* 763 F.2d 1560 (7th Cir.1985) (en banc). In this case, a civil rights suit by the occupants of a home subjected to a warrantless search and seizure, the court held that it was not unreasonable for police to make an emergency entry of the address of the registered owner of a car used in the course of two robberies by two men who had killed four persons, wounded three others, and briefly taken a young girl hostage. In reaching that conclusion, the court made the following observations:

> The situation was an emergency in about as vivid a sense as can be imagined. A man had (with his partner) just shot seven people. There was no reason to think he had finished shooting; there was every reason to think he would put up a violent resistance. If the police delayed for a warrant, the killer might barricade the house, take hostages, or flee and kill again before they could catch up with him.

*Id.* at 1563. Although the situation was less dramatic in the case before us, these same observations remain applicable.

**11.** Since police had not yet entered the building, we do not take into account the fact that Harris's mother told the police, after she answered their knock, that her son was present on the premises.

2, and the motions judge was unable to determine which version was most credible.

Seventh, the police entered the building in the dead of night, at an hour when it was highly unlikely that anyone would be awake, thereby increasing the impact of the intrusion on the occupants' privacy. We also recognize, however, that the early morning hour might well have increased the time that would have been required to obtain a warrant. *See Dorman,* 140 U.S.App.D.C. at 321, 435 F.2d at 393.

Finally, we must answer the last *Minick* question: whether the police entered the premises without unreasonable delay once they decided to arrest Harris. *See Minick,* 455 A.2d at 876. As we noted above, Detective Sitek decided to move against Harris at approximately 2:45 a.m. to 3:00 a.m. By 3:50 or 3:55 a.m., according to Sitek, his arrest team had arrived at 1372 Kenyon Street. Harris's mother testified that the police knocked on her door at 4:00 a.m. Thus, at most one hour and a quarter elapsed between the time that the police decided to make the arrest and the time that they entered the Harris apartment. Although Sitek testified that it was sometimes possible to obtain a warrant within an hour, he also noted that the process could take as long as two or three hours. *See Derrington,* 488 A.2d at 1324 (detective knew it would take two to three hours to obtain warrant). As there is no authorization for the issuance of telephonic warrants in this jurisdiction, *see Minick,* 455 A.2d at 878 n. 3, we will not second-guess Detective Sitek's judgment that he would have been unable to obtain a warrant and reach Harris's apartment in the same amount of time, *see Derrington,* 488 A.2d at 1324 (hour-and-a-quarter delay between identification of suspect and arrest operation not unreasonable). Nor is there any other evidence in the record to suggest that the police delayed their arrest action unreasonably.

Considering all of these factors, we conclude that the police acted reasonably in entering the apartment building without a warrant. The police had probable cause to arrest Harris and reason to believe that he was extremely dangerous, unpredictable, and a continuing threat to the community. They also had grounds for thinking that Harris would be armed and some basis for believing that he would be on the premises even before Harris's mother confirmed this suspicion. While there was no evidence that Harris was likely to escape, this was counterbalanced by the strong police interest in determining whether Harris was in fact on the premises, in protecting residents of the apartment building, and in preserving evidence. Finally, there is no evidence that the police delayed unreasonably in executing their plan once they had decided to arrest Harris. It is true that the entry took place late at night and may have been forced, but we conclude that the need to apprehend a murder suspect whom police had reason to fear might kill again randomly, without warning, outweighed the intrusiveness of the forced entry into the building.

We conclude that exigent circumstances also justified the entry into Harris's apartment. At that point, in addition to the information described above, the police had also learned from Harris's mother that Harris was indeed present on the premises. Moreover, the police entry into the apartment was relatively peaceful. Although the motions judge found that this entry was nonconsensual, the record also shows that the police did not break into the apartment. These factors, taken together with the circumstances already outlined, rendered the warrantless entry into Harris's apartment lawful.

A nonconsensual, warrantless entry and arrest in a private residence at 4:00 a.m. is the kind of police action that most Americans would consider typical of a totalitarian state; it should be sanctioned in our society only in the most extreme circumstances. We believe, however, that such exceptional circumstances existed in this case, given the severity and random nature of the crime and the realistic possibility that the criminal would kill again if not apprehended immediately.

Accordingly, we conclude that Harris's arrest in his home was lawful and that the

gun clip found on his person is admissible against him as evidence properly seized in a search incident to arrest. *See United States v. (Willie) Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476–77, 38 L.Ed.2d 427 (1973) ("in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment"); *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.").

### III. THE SEARCH OF THE BEDROOM

 Having concluded that the warrantless entry to arrest Harris was lawful, we must now consider whether the search of Harris's bedroom was also justified in connection with that arrest. In general, where police have lawfully entered a residence to effect an arrest, warrantless, nonconsensual searches of the premises are reasonable in four situations. First, until they have located the suspect they seek, the police may search the premises generally for the purpose of apprehending the suspect. *See Buie,* 494 U.S. at 332–33, 110 S.Ct. at 1097; *Hayden,* 387 U.S. at 299, 87 S.Ct. at 1646; *United States v. Manley,* 632 F.2d 978, 986 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Once the suspect has been found, however, that rationale for searching the premises disappears. *See Buie,* 494 U.S. at 333, 110 S.Ct. at 1097; *Brooks,* 367 A.2d at 1305. Second, in the course of arresting the suspect, the police may search the area within the arrestee's "immediate control" to prevent the arrestee from grabbing a weapon or evidence.

*See Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040. Third, even after the arrestee has been seized, the police may in certain situations also undertake a "protective sweep" of the premises to protect against the danger of an attack from an accomplice while they are completing the arrest procedure. *See Buie,* 494 U.S. at 334, 110 S.Ct. at 1098; *Earle v. United States,* 612 A.2d 1258, 1264–65 (D.C.1992). Finally, both before and after the arrest a further search of the premises—limited in scope—may be justified by "emergency" or "exigent" circumstances, *e.g.,* a reasonable belief that a person may be in need of aid or that important evidence may be destroyed or removed.[12] *See Michigan v. Tyler* 436 U.S. 499, 510, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978) (investigation of causes of fire); *Earle,* 612 A.2d at 1263–64 (search for possible shooting victims); *Clark v. United States,* 593 A.2d 186, 196–199 (D.C.1991) (same); *Sturdivant v. United States,* 551 A.2d 1338 (D.C.1988) (limited search for murder weapon justified by inherent danger of sawed-off shotgun and possibility that other household members would use or destroy it), *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). *See generally Thompson v. Louisiana,* 469 U.S. 17, 22, 105 S.Ct. 409, 412, 83 L.Ed.2d 246 (1984) (warrantless search of premises under emergency exception limited to items in plain view during "victim-or-suspect" search); *Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (same); *Douglas–Bey v. United States,* 490 A.2d 1137, 1138–39 (D.C.1985) (same). Clearly, neither of the first two grounds applies to the search of Harris's bedroom, because Harris was already in custody in the apartment hallway when the police entered his bedroom, and because the bedroom was manifestly beyond his immediate control as he stood in the hall-

---

12. In *Earle,* 612 A.2d at 1263, we characterized the "emergency" exception to the warrant requirement as a subset of the exigent circumstances exception. We have used the term "emergency," as distinguished from "exigent circumstances," to refer to those situations "requiring preventive action, even though no crime assuredly has been committed; *e.g.,* a person

inside the premises is reasonably believed to be in peril." *Booth,* 455 A.2d at 1354. Of course, there may be situations where more than one justification for a warrantless search may apply. *See Earle,* 612 A.2d at 1264 (police officers' right to enter and investigate the premises under emergency exception coincided with their right to conduct protective sweep).

way. The government, therefore, urges us to uphold the search either as a protective sweep or on the basis of exigent circumstances.

### A.

■ In *Buie*, the Supreme Court defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." 494 U.S. at 327, 110 S.Ct. at 1094. The Court explained the policy basis for allowing such a search in the following terms:

> The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk [*see Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968); *Michigan v. Long*, 463 U.S. 1032 [103 S.Ct. 3469, 77 L.Ed.2d 1201] (1983)] occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Buie*, 494 U.S. at 333, 110 S.Ct. at 1098. The Court then went on to hold that two types of protective sweeps are reasonable and lawful under the Fourth Amendment.

First, "as an incident to the arrest [police] officers could, as a precautionary matter and *without probable cause or reasonable suspicion*, look in closets and other spaces immediately adjoining the place of* arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. at 1098 (emphasis added). This limited type of protective sweep of spaces immediately adjoining the place of arrest resembles the search of areas within the arrestee's immediate control sanctioned in *Chimel*, in that the police may make both types of searches as a routine precautionary procedure, without any particularized, reasonable suspicion.[13] In either case the exception accounts for a police officer's natural—and reasonable—instinct for an immediate, narrow search for self-protection from the arrestee (*Chimel*) or from any possible third party who could fire a weapon or otherwise accost the officer at close range (*Buie*).

Second, police may undertake a broader search of the home, *i.e.*, beyond immediately adjoining spaces, when they are aware of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."[14] *Buie*, 494 U.S. at 334, 110 S.Ct. at 1098. Like the pat-down for weapons approved in *Terry* or the search of the automobile passenger compartment sanctioned in *Long*, this second kind of protective sweep in the home can only be justified by a reasonable, particularized suspicion. *See Buie*, 494 U.S. at 334 & n. 2, 110 S.Ct. at 1098 & n. 2. *See generally* Cuthbertson, *supra* note 13, at 175–76.

We believe that the brief search of Harris's bedroom was lawful under the first of these two categories. Although the *Buie* court did not define further what it meant by the term "spaces immediately adjoining the place of arrest from which an attack could be immediately launched," other courts applying *Buie* have interpreted this

---

13. *See generally* Mark A. Cuthbertson, Comment, Maryland v. Buie: *The Supreme Court's Protective Sweep Doctrine Runs Rings Around the Arrestee*, 56 ALB.L.REV. 159, 172–74 (comparing *Buie* and *Chimel*).

14. The Court in *Buie* observed that its holding was not inconsistent with its earlier language in *Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040, limit-

ing warrantless searches incident to arrests in the home to areas within the arrestee's immediate control. *Chimel*, the *Buie* court said, had been concerned only with "the threat posed by the arrestee, not the safety threat posed by ... unseen third parties in the house." *Buie*, 494 U.S. at 336, 110 S.Ct. at 1099.

phrase to include rooms that are directly adjacent to the place of arrest.[15] In this case, although the motions judge made no findings on this issue, uncontradicted testimony at the suppression hearing clearly indicated that Harris's bedroom opened directly onto the interior hall where he was held, frisked, and arrested. Indeed, the police first encountered Harris as he was leaving this bedroom. Consequently, consistent with caselaw from other jurisdictions, we conclude that Harris's bedroom definitely falls within *Buie*'s first category of "spaces immediately adjoining the place of arrest" that police may briefly search, even without reasonable suspicion, as a routine safety precaution.

It is true that the police had no actual evidence that a possible attacker would be in this room. They had already apprehended Harris himself, and there was no evidence that any accomplices had been involved in the Park Road shooting. The only indication that anyone else might have been there was the thump heard by Officer Bailey, but this had occurred before Harris had left the bedroom, and Bailey attributed the noise to Harris's dropping a gun. Nevertheless, even though the police may not have had any factual basis for believing that anyone else was in the bedroom, they were entitled under *Buie* to make a protective sweep of the room as a reasonable, general precaution because it immediately adjoined the place of arrest.[16]

**15.** *Compare United States v. Mayo,* 792 F.Supp. 768, 773–74 (M.D.Ala.1992) (guns, seen inside bedroom from doorway immediately adjacent to room where suspect was found and placed under arrest, held admissible under *Buie,* even though police lacked adequate grounds for suspecting presence of other individuals) *and United States v. (Noah) Robinson,* 775 F.Supp. 231 (N.D.Ill.1991) (protective sweep of locked bedroom held permissible, given that suspect was arrested at the mouth of interior hallway that led to bedroom) *with Smith v. State,* 565 N.E.2d 1059 (Ind.1991) (warrantless search of locked storage room could not be justified as protective sweep, where arrest was made in living room, storage room door was located off of another room, and the police otherwise lacked reasonable suspicion that storage room might harbor attacker).

**16.** This conclusion is also consistent with earlier, pre-*Buie* caselaw in this jurisdiction holding that, in connection with an arrest, a precautionary search for persons and weapons may be justified even where there is little or no direct evidence that there is anyone else on the premises who might threaten police.

In *United States v. Miller,* 145 U.S.App.D.C. 312, 449 F.2d 974 (1970), the United States Court of Appeals for the District of Columbia Circuit held admissible evidence obtained during the search of a suite of offices where police had just apprehended an armed robbery suspect. "Although the man [the police] sought was in view from the moment the [office] door was opened, they had no way of knowing who else might be on the premises," the court observed. "In those circumstances, the police could justifiably conduct a search of the suite to assure themselves that no hostile and possibly dangerous persons were hiding in the other rooms." *Id.* at 315, 449 F.2d at 977.

Similarly, in *Vance v. United States,* 399 A.2d 52 (D.C.1979), this court held admissible evidence obtained from a bedroom search conducted after the warrantless arrest on the premises of two suspects in an attempted armed robbery. We observed that the search was justified as a protective sweep because three suspects had been reported and it was reasonable for the police to believe that a third person might be hiding in the apartment. *See id.* at 58. But, we said further, "[e]ven if there had not been mention of a third suspect, the police could have engaged in the precaution of ascertaining whether some other person was still lurking in a back room with the as yet undiscovered sawed-off shotgun." *Id.*

Finally, in *Ruth v. United States,* 438 A.2d 1256 (D.C.1981), we held that, after apprehending in an apartment two men suspected of armed assault, police officers were entitled to conduct a protective search of the bedroom where they had earlier seen the men with a woman, even though it was not clear that anyone was still in that room. *See id.* at 1260 & n. 5. As in *Vance,* we noted that the suspects were believed to be armed, yet no weapons had been found before the search of the bedroom—a factor also present in the case before us. *See id.* at 1260.

These pre-*Buie* cases relied on language from *Hayden* authorizing police, in situations where "delay in the course of an investigation ... would gravely endanger" lives, to undertake a warrantless "search of the house for persons and weapons [to insure] that [the suspect] was the only [person] present and that the police had control of all weapons which could be used against them." *Hayden,* 387 U.S. at 298–99, 87 S.Ct. at 1645–46. However, the search at issue in *Hayden* took place before and during the arrest of the suspect, while the searches at issue in *Miller, Vance,* and *Ruth* took place after the suspects had been apprehended. To the extent that *Miller, Vance,* and *Ruth* suggest that the police do not even need a reasonable suspicion that a potential attacker may be present else-

## B.

■ Where police have grounds for conducting a protective sweep, it must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327, 110 S.Ct. at 1094. Thus, a valid protective sweep may not be transformed into a full-scale search for evidence. *Id.* at 335, 110 S.Ct. at 1099. "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation'...." *Mincey*, 437 U.S. at 393, 98 S.Ct. at 2413 (quoting *Terry*, 392 U.S. at 26, 88 S.Ct. at 1882). However, evidence discovered in plain view during the course of a valid, properly limited protective sweep may be seized lawfully. *See Earle*, 612 A.2d at 1265 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467–68, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971)). *See generally Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

■ In this case, the motions judge found that an officer entering Harris's bedroom saw an ammunition clip on a book shelf and two guns between the bed and the wall. Although the judge did not specifically find that these objects were in "plain view," the supporting record clearly indicates that the weapons and ammunition were readily visible to police as they checked to make sure that no one else was in the room. Detective Sitek testified that he saw "a separation of the bed from the wall," that he "thought there could be somebody hiding back there," and that when he went to look he saw a pistol. Officer Bailey specifically testified that the pistol and the Tec–9 automatic weapon were in plain view once he walked up to the bed in Harris's room and that he did not have to move anything to see them. Thus, the record demonstrates that (1) the scope of the search of Harris's bedroom was no broader than necessary to assure that there was no one else in the room and (2) the police discovered the weapons and the ammunition clip in plain view in the course of that search.[17]

Having arrived at this conclusion, we need not consider the government's alternative contention that the search of Harris's bedroom can also be justified on the ground of exigent circumstances. In any case, the officers' testimony clearly indicated that, in undertaking the search of the bedroom, it was their safety that was uppermost in their minds, rather than the danger that evidence might be destroyed or that weapons left on the premises might harm others. That testimony conforms to the *Buie* exception.

## IV. CONCLUSION

In sum, our analysis of the record has led us to the following conclusions. First, we conclude under the exigent circumstances exception to the warrant requirement, as formulated in *Dorman*, *Minick*, and *Derrington*, that the police were entitled to enter Harris's building and apartment to arrest Harris, especially given the evidence suggesting that he was a random and unpredictable killer who might strike again, without provocation, if not apprehended as soon as possible. Consequently, the arrest of Harris was lawful and the

where on the premises to undertake a full-scale post-arrest sweep (*i.e.,* a search beyond spaces immediately adjoining the place of arrest), these cases apparently exceed the limits of *Buie*. For that reason, we do not rely on them in reaching our result in this case. This is not to say, however, that the results of *Miller, Vance,* and *Ruth* are no longer valid, since it appears that the facts of these cases might have justified searches either under *Buie* (as searches of immediately adjoining spaces or on grounds of reasonable suspicion of the presence of an attacker) or under the exigent circumstances exception (as searches for dangerous weapons that might be used or removed). *See, e.g., Edwards v. United States,* 619 A.2d 33, 35–36 (D.C.1993)

(warrantless entry and search for rifle justified under exigent circumstances exception, notwithstanding fact that police had already apprehended suspect, where police had just seen suspect with rifle allegedly used in assault and they feared that rifle could be found by someone else).

**17.** This conclusion is not inconsistent with the testimony of Harris's sister that Harris's bed was located against the wall and that she saw a police officer reach behind the bed, since she did not indicate that the officers could not have seen the guns between the bed and the wall.

evidence obtained from his person was admissible because it resulted from a search incident to arrest. Second, we conclude under *Buie* that the police, having begun the process of arresting Harris in the apartment's interior hallway, could properly make a protective sweep of Harris's bedroom (even though they lacked any specific, articulable basis for suspecting that someone else was in there who might endanger their safety), because the bedroom was an adjoining space from which an attack might be launched. Once inside the bedroom, police could lawfully seize the guns and ammunition there because this evidence was in plain view.

Accordingly, we reverse the order of the trial court suppressing this evidence and remand this case for further proceedings.

*So ordered.*