**UNITED STATES of America**

v.

**Woodrow ALEXANDER, Oscar Castro–Severino, Domingo Guevara–Feli Lee Haven, Nelson Lopez, Rafael Mercedes–Severino, Francis Severino.**

Cr. No. 2:95 CR 31–03.

United States District Court,
D. Vermont.

Feb. 8, 1996.

Karen Rush Shingler, Burlington, VT, for Francis Severino.

Thomas A Zonay, Carroll, George & Pratt, Rutland, VT, John Lawrence Pacht, Hoff, Curtis, Pacht, Cassidy & Frame, P.C., Christopher Lee Davis, Langrock, Sperry & Wool, Richard C. Bothfeld, Bothfeld & Volk, P.C., Burlington, VT, for Oscar Castro–Severino.

Mark Alan Kaplan, Jarvis & Kaplan, Burlington, VT, Edward M. Kenney, Law Office of Edward M. Kenney, Richmond, VT, for Rafael Mercedes–Severino.

Mark David Oettinger, Lisman & Lisman, Burlington, VT, for Domingo Guevara–Feli.

Elizabeth Fey Novotny, Perry & Schmucker, South Burlington, VT, for Irving Castillo–Hernandez.

Cindy Ellen Hill, Middlebury, VT, for Woodrow Alexander.

Theodore Frederic Robare, Theodore Robare, P.C., Rutland, VT, for Lee Haven.

Peter W. Hull, Asst. U.S. Atty., Office of the United States Attorney, District of Vermont, Burlington, VT, for U.S.

## OPINION AND ORDER

SESSIONS, District Judge.

On March 30, 1995, the Grand Jury returned a one-count indictment charging Defendants Francis Severino, Oscar Castro–Severino, Rafael Mercedes–Severino, Domingo Guevara–Feli and Irving Castillo–Hernandez with conspiracy to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). On September 29, 1995, Defendant Castro–Severino filed a MOTION TO SUPPRESS EVIDENCE and a MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH THE GOVERNMENT'S IMPROPER USE OF PHOTOGRAPHS TO IDENTIFY DEFENDANT. The Government opposes these motions.

In his Motion to Suppress Evidence, Castro–Severino objects to the warrantless entry and seizure of drugs within his residence by Vermont Drug Task Force agents. He also objects to his arrest at the time of the agents' entry and subsequent search. In his second Motion to Suppress, Castro–Severino contests the display of photographs of himself and other co-defendants to cooperating individuals (CI) who will be government witnesses at trial. He seeks to suppress testimony concerning the CIs' identification of him. Finally, Castro–Severino filed a MOTION FOR BILL OF PARTICULARS, requesting that the Government disclose numerous facts concerning the conspiracy, including the names of all co-conspirators, dates and times when each co-conspirator became involved, and summaries of the evidence linking each defendant to the conspiracy.

Raising the same issues addressed in motions filed by Castro–Severino, Mercedes–Severino filed a MOTION TO SUPPRESS SUGGESTIVE PRETRIAL IDENTIFICATION and a MOTION FOR BILL OF PARTICULARS. Mercedes–Severino joined in the Motion to Suppress involving the search of the residence filed by Castro–Severino.

Castillo–Hernandez filed similar motions regarding the warrantless entry into his residence and the display of his photograph to potential government witnesses. Based upon the Government's motion, the Court dismissed the indictment against Castillo–Hernandez.

A hearing was conducted by the Court on November 13, 1995 on Defendants' Motions to Suppress. Prior to the Court's ruling, the

Government filed a superseding indictment on November 30, 1995 adding a number of substantive counts of distribution of cocaine and Defendants Woodrow Alexander, Lee Haven and Nelson Lopez.

Because the motions filed by Castro–Severino and Mercedes–Severino raise the same issues, the Court will consolidate them for purposes of this opinion.

## BACKGROUND

The Drug Enforcement Administration (DEA) Drug Task Force had been conducting an investigation into a cocaine distribution operation involving individuals from the Dominican Republic from June, 1994 to March, 1995. They conducted approximately thirty-five controlled purchases of cocaine using a half dozen CIs. The target of the investigation was a group of Dominican nationals from the greater Boston area. Agents learned that the traffickers used area motels and apartments to distribute cocaine, that they would frequently change the locations of their operations, and that they would receive shipments of cocaine from Boston every one to two weeks. Agents also learned how the drugs were distributed in Vermont. The traffickers would sometimes work together as one unit and at other times divide into smaller groups. They would divide the drugs into smaller units upon arrival in Vermont and place them in safe houses, using motels or local apartments. They would also bury the cocaine in the ground behind these residences. The Dominicans would use local acquaintances to distribute the cocaine in the Burlington area.

On March 20 or 21, 1995, a confidential informant entered a 74 Archibald Street apartment to conduct a controlled purchase of cocaine. Agents had known that the apartment was the residence of the subjects of the investigations at that time, although no cocaine had been purchased from that location previously. The informant was then instructed by "Carlos," later identified as Defendant Guevara–Feli, to go to Woodrow Alexander's apartment at 4 Spring Street to obtain the cocaine. The informant went to that residence and obtained cocaine from Alexander in the presence of Mercedes–Severino.

On March 23, 1995, agents returned to 74 Archibald Street at about 6:30 p.m. to attempt to purchase cocaine with the assistance of a cooperating individual. The CI had lived with the suspects, had distributed cocaine for them in the recent past and had provided reliable information to DEA during the investigation. Six agents using three vehicles were stationed in the neighborhood providing surveillance of the area. The CI entered the residence and was told by Guevara–Feli that there was no cocaine, but that a shipment was expected at 9:00 p.m. that evening. The informant left the residence and relayed that information to the agents.

DEA agents had been unable to witness delivery of quantities of cocaine to the suspects. Generally, traffickers are reluctant to share information with purchasers concerning times when deliveries of cocaine are to arrive for fear of theft. Even when traffickers do provide such information, agents have learned from experience that such information is unreliable because of traffickers' concerns about protecting their sources of supply. They also determined that it would take about four hours to obtain a search warrant. Because of the unreliability of the information, the agents decided to continue the surveillance to see if any shipments arrived, but not to seek to obtain a warrant.

The apartment is located in a residential community in the old north end of Burlington. That area is particularly problematic for conducting surveillance because of the heavy pedestrian and motor vehicle traffic, the close-knit nature of the community, and the fact that members of the surveillance team are easily recognizable by local residents.

For the next few hours, agents observed a lot of pedestrian traffic in the area. They saw approximately six people enter the apartment, stay for a short period and leave. According to the experience of Agent Charles Kirk, that fact was indicative of persons involved in the drug trade. No efforts were made to speak with any of the individuals who entered or exited the apartment.

At approximately 9:10 p.m., a brown Volvo with Massachusetts plates arrived and parked across from the apartment. The vehicle had been recognized by the agents as being present during an attempted controlled purchase of cocaine made earlier in the investigation. Two individuals exited the vehicle carrying duffel bags and walked into the apartment at 74 Archibald Street. Members of the Task Force had seen the car at area motels during the investigation.

The CI was sent into the apartment immediately to obtain cocaine and to determine if the shipment had arrived. The CI was searched to verify that he/she had no drugs in his/her possession and given $800 in marked government funds to purchase the cocaine. The CI also wore a wire so that agents could monitor conversations.

Prior to the return of the informant, three individuals exited the residence and left the area in the Volvo. The earlier investigation had led agents to believe that the traffickers would work in teams. The teams would switch at each delivery. The group that brought the cocaine from the Boston area would stay in Vermont to conduct sales until the next delivery, while the team that had been in Vermont would return to Boston with the week's profits. Four agents were given the task of stopping the Volvo once it had left the immediate vicinity of the apartment.

The CI returned after about ten minutes with one-half ounce of cocaine allegedly purchased from Castro–Severino. He/she identified the occupants of the residence and the fact that three people had just left, possibly with the money used to purchase the cocaine. The CI recounted observing a large quantity of cash and about one hundred "eight-balls," bags containing one-eighth ounces of cocaine.

While debriefing the CI, agents saw a woman enter the apartment and leave after about one minute. They made a tentative identification of that person as Jodi Illingsworth, who was known to associate with the suspects and to use and sell cocaine. Due to a lack of resources, agents did not question her after she left the apartment. No information had been received from those assigned to stop the Volvo. The senior officer in charge, DEA Agent Rick Carter, then decided to enter the apartment to secure it while a warrant was being obtained. Agent Carter testified to his reasons for entering the apartment without a warrant as follows:

> I decided that we had to—we had no choice. We had people arriving and going. We just learned of a large quantity, extremely large quantity of drugs being in there. That's a pretty unusual amount for the north end of Burlington. So I—I decided, and talking to Agent Doud also, over the radio, he also recommended if there was anybody trying to leave, to go in and secure the location. When I observed that woman coming and going, as far as I was concerned, the evidence was starting to leave, that huge amount of drug could be leaving, and we had to secure the residence.

[TR 85]. Agent Charles Kirk testified that agents also considered that the traffickers would quickly divide up the cocaine and hide it in different locations as they had done in the past, that continued surveillance would be difficult due to constant pedestrian traffic in the neighborhood and that it usually took about four hours to obtain a warrant.

Agents Carter, Kirk, Lewis and Cole met outside of the apartment building at about 9:30 p.m. The suspects' apartment was located on the second floor of 74 Archibald Street and the agents went in the side entrance and up the stairs. The door to the apartment was ajar. According to Agent Kirk, as they knocked and announced their purpose, the door swung open. Agent Carter does not recall if there was a knock or merely a pushing of the door to open it. They moved quickly into the apartment to secure it while announcing that they were police officers.

Two people were in the apartment. Castro–Severino was sitting on a couch in the living room and began to stand up as the agents entered. Agent Kirk recognized Castro–Severino from earlier controlled purchases and concluded that he had probable cause to place him under arrest for those earlier buys. Castillo–Hernandez was also in the living room and attempted to flee into the

bedroom. The agents secured both individuals.

Next to Castro–Severino was a quantity of cocaine divided into numerous eighth-ounce bags. He was wearing a sweatshirt with a front pocket which was bulging with bags containing cocaine. Agents seized the cocaine on the couch and from the front pocket of Castro–Severino's sweatshirt. Once agents had secured the apartment, Agent Kirk left to obtain a warrant. Agents did not search the apartment prior to the warrant being signed.

U.S. Magistrate Jerome Niedermeier signed a search warrant at about 1:30 a.m. that evening. Agents found drug paraphernalia and additional quantities of cocaine during the execution of the warrant.

Agents used a number of CIs during the course of the investigation. Often those informants were close associates of the suspects and were involved in a number of drug transactions. The CIs knew the Dominicans only by their street names.

Following the arrests of the Defendants, agents showed photographs of the five arrested individuals to two informants, Jodie Landry and Marco Sanchez, to match individuals to street names. One photograph of each of the Defendants was shown to the informants. The witnesses were asked to put street names to the photographs of persons whom they recognized. No effort was made by law enforcement officers to insure that the photographic display was not unduly suggestive, because both informants had extensive contact with some of the Defendants over a lengthy period of time. The first informant, Jodie Landry, allegedly had purchased drugs from the Defendants on a weekly basis over several months. She eventually sold drugs to an undercover officer and began to assist investigators. She conducted a number of controlled purchases with the Defendants prior to their arrest. The CI, Marco Sanchez, had also been dealing drugs with the Defendants. He had sold drugs for them prior to going to prison in August, 1994 and after he was released in January, 1995. He began to assist law enforcement officers in March and made a number of controlled purchases from the defendants. Both Lan-

dry and Sanchez identified the Defendants as participants in the cocaine conspiracy.

## I. FOURTH AMENDMENT QUESTIONS

### A. *Warrantless Entry Into The Archibald Street Apartment*

The Government concedes that DEA agents entered the Archibald Street apartment without a warrant. It argues that the warrantless entry was justified under the exigent circumstances exception to the warrant requirement.

■ Searches within a home without a warrant are presumptively unreasonable in violation of the Fourth Amendment absent exigent circumstances. *United States v. Karo*, 468 U.S. 705, 715, 104 S.Ct. 3296, 3303–3304, 82 L.Ed.2d 530 (1984); *Welsh v. Wisconsin*, 466 U.S. 740, 748–749, 104 S.Ct. 2091, 2096–97, 80 L.Ed.2d 732 (1984). The Government bears the burden of proving the existence of such an exigency to justify warrantless searches. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).

■ At the outset, entry into the apartment was for the limited purpose of securing the residence while a warrant was obtained. The Supreme Court has made a clear distinction between entries to secure residences as opposed to entries for the purpose of conducting full searches. *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The Court in *Segura* termed entries to secure property "seizures" for Fourth Amendment purposes. A "seizure" only affects possessory interests in one's property. A search, on the other hand, impacts an individual's privacy interests. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The Court stated in *Segura*: "Recognizing the generally less intrusive nature of a seizure [citations omitted], the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible." *Id.* at 806, 104 S.Ct. at 3386.

In *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the Supreme Court addressed the exigency requirement in a narcotics case. The Court found that the existence of narcotics on the premises alone did not justify exigent circumstances, absent a showing that the drugs were in the process of being destroyed or removed from the jurisdiction. The immediacy of the threat of destruction of evidence is the key factor in assessing the exigency of the circumstances.

The United States Court of Appeals for the Second Circuit has defined the exigency exception to the warrant requirement on numerous occasions. *United States v. Campbell*, 581 F.2d 22, 25 (2d Cir.1978); *United States v. Gallo–Roman*, 816 F.2d 76, 79–80 (2d Cir.1987); *United States v. Medina*, 944 F.2d 60, 68 (2d Cir.1991); *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir.1992).

■ In *Campbell*, the Court defined exigent circumstances as applying generally to those situations in which officers cannot effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly. *Campbell*, 581 F.2d at 25. The test for determining whether a warrantless entry into a residence is justified is an objective one. *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990) (en banc). The court must determine from the totality of circumstances whether law enforcement officers were confronted with an "urgent need" to take action. *MacDonald*, 916 F.2d at 769.

■ The Second Circuit has adopted the factors set forth in *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970) (en banc). *See United States v. Gordils*, 982 F.2d at 69. As summarized in *MacDonald*, the court should consider:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the

peaceful circumstances of the entry. 916 F.2d at 769–70.

However, these factors are merely illustrative. The presence or absence of any of these factors is not determinative. *United States v. Cattouse*, 846 F.2d 144, 147 (2d Cir.1988). In fact, there may be circumstances in which the presence of one factor alone can justify a warrantless entry. *United States v. Gallo–Roman*, 816 F.2d at 79–80.

■ A number of the *Dorman* factors are present in the case at bar. First, the Court finds that the nature of the offense at issue involves an element of violence. Although there is no indication that law enforcement officers knew that these individuals had a history of violence, drug trafficking in cocaine necessarily includes a reasonable risk of violence.

Second, there is a clear showing in the instant case that probable cause existed to believe that the suspects had been involved in trafficking and that they were on the premises at the time of the search. The confidential informant had been in the residence minutes before execution of the entry into the apartment and had purchased cocaine from the suspects. Probable cause certainly existed for the arrest of the individuals in the apartment based upon this controlled purchase.

Third, there was the possibility of escape if agents delayed their entry. Agents were located within an area of Burlington in which they could have been identified by others involved in the drug trade. Disclosure of their presence could have prompted the suspects to leave the apartment. Certainly, the risk of disclosure increased with the passage of time, and a delay of four hours for the obtaining of a warrant increased the chances that their presence would be communicated.

The *Dorman* factors appear more applicable to cases involving arrests of individuals. In the instant case, the Court is more concerned with the risk of destruction or loss of evidence. The Third Circuit has cited other factors more relevant to destruction of evidence cases in *United States v. Rubin*, 474 F.2d 262 (1973):

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic [citations omitted] *Id.* at 268–69.

Law enforcement officers had a reasonable belief at the time of entry into the Archibald Street apartment that there was a substantial risk that the evidence of cocaine trafficking was being lost and that there was an urgent need to move quickly. The CI told the agents that there were large quantities of drugs divided into small, saleable quantities in the apartment within minutes of the entry. Agents had information in the past indicating that the suspects would quickly divide up and distribute the drugs into other areas of the city. In fact, no purchases had occurred at Archibald Street because that was considered a location in which the suspects slept. Agents then observed persons thought to be involved in the drug trade enter and leave after a short period. Based upon experience, agents concluded that the quantity of drugs was beginning to be distributed. The agents' concern about the loss of the contraband was heightened by the ready destructibility of cocaine and their experience that drug traffickers often attempt to dispose of narcotics to prevent arrest.

Defendants have argued that law enforcement officers should have attempted to obtain a warrant prior to entry into the apartment. They assert that officers could have pursued the obtaining of a warrant prior to the arrival of the drugs and executed it once the Volvo arrived. As a result, there was no urgent need to conduct a warrantless search.

Prior to the arrival of the Volvo and observations of the drugs within the apartment by the CI, probable cause did not exist to justify search of the Defendants' residence. Agents testified that traffickers often mislead others as to the time of arrival of drugs to prevent theft. No drugs had been purchased by cooperating individuals from that residence in the past. Not only did the CI not see drugs in the apartment during the first entry, but suspects had indicated that no drugs were on the premises. Probable cause existed only upon disclosure by the CI of observations of the drugs in the apartment.

Agents testified that the obtaining of a warrant would take approximately four hours. In fact, it took about four hours to obtain a warrant in this case. The agents had a legitimate concern that evidence of drugs may have disappeared during a four hour delay.

■ Although not necessary given the facts of this case, telephonic warrants pursuant to Fed.R.Crim.P. 41(c)(2) are clearly preferred by the Court. Rule 41(c)(2) provides a mechanism by which officers can obtain quick judicial review of search warrant applications. Procedures are in place within this district to insure the availability of judicial officers for telephonic warrants, and the Court recommends that such procedures be utilized in the future.

Based upon the above-cited facts, the Court finds that exigent circumstances existed to justify a warrantless entry into the residence for the limited purpose of securing it until a warrant could be obtained.

### B. *Seizure of drugs with residence*

Once the agents entered the residence to secure it while a warrant was obtained, they saw baggies containing white powder believed to be cocaine next to Castro–Severino. A large bulge was observed in Castro–Severino's sweatshirt. Agents were able to see baggies of cocaine inside the sweatshirt. Castro–Severino was known by Agent Kirk to have been involved in earlier drug transactions. He was placed under arrest and the drugs were seized.

■ Although the agents were within the apartment for the purpose of securing it, they were constitutionally permitted to seize the cocaine under two exceptions to the warrant requirement. The drugs were observed

in plain view at the time of entry into the apartment. Since the officers had the right to be present in the apartment, they could seize any contraband found within their plain view. *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Cocaine found on the couch and within Castro–Severino's sweatshirt were in plain view and subject to seizure.

Agents had placed Castro–Severino under arrest at the time of the seizure of the drugs. Probable cause existed both because of the drugs observed by the agents and by the earlier transaction known by Agent Kirk. Law enforcement officers were then permitted to search Castro–Severino and in the area in his immediate vicinity at the time of the arrest. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Seizure of the cocaine was justified under the search incident to arrest exception to the warrant requirement.

Defendants' Motions to Suppress Evidence are hereby DENIED.

## II. DUE PROCESS ISSUES

### A. *Photographic Displays to CIs.*

Defendants have also objected to the display of photographs shown to two CIs, Jodie Landry and Marco Sanchez. Both Defendants argue that the showing of photographs to the witnesses was unduly suggestive. They also seek to suppress any in-court identification by these witnesses as products of the illegal photographic display.

The Government indicated at the suppression hearing that it does not intend to introduce the photographs at trial. The Government does anticipate calling Landry and Sanchez, both of whom are expected to identify the Defendants as persons involved in the conspiracy. The outstanding issue is whether the in-court identification has been sufficiently tainted by the photographs to make that identification unreliable.

■ In evaluating whether or not an in-court identification violates due process, courts apply a two-prong test. *United States v. Kwong,* 69 F.3d 663 (2d Cir.1995). The court must determine whether the pre-trial identification procedures were impermissibly suggestive. If so, the court must decide whether the in-court identification was the product of the suggestive procedures or whether it is independently reliable. *United States v. Tortora,* 30 F.3d 334, 337 (2d Cir. 1994). A pretrial photographic procedure offends due process if it "is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384–85, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

■ The standards for determining whether an in-court identification is independently reliable were set out in *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The Supreme Court established five criteria: "... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* Each of these factors must be assessed in light of the totality of circumstances. *United States v. Concepcion,* 983 F.2d 369, 378 (2d Cir. 1992).

■ Both witnesses had extensive contact with Castro–Severino and other Defendants allegedly engaged in the conspiracy. Both witnesses had been participants in the conspiracy. They had purchased drugs from the Defendants over an extended period of time. They also had sold drugs for the Defendants. Sanchez had lived with Castro–Severino in the past. Both appeared to be certain of their identification. Assuming, arguendo, that the photographic display was unnecessarily suggestive, the extensive contact that the witnesses had with the Defendants over a period of several months makes any in-court identification independently reliable.

The Court hereby DENIES the Defendants' Motions To Suppress Pre–Trial Identification.

**626**

### III. BILL OF PARTICULARS

Castro–Severino filed a Motion for Bill of Particulars pursuant to Fed.R.Crim.R. 7(f). He argued that the indictment failed to set forth a charge with sufficient particularity to enable him to prepare for trial, to prevent surprise and to avoid subsequent prosecution for the same offense. He moved to compel the Government to specify the precise details concerning his involvement in the allegations.

 The decision regarding whether or not to grant a bill of particulars is within the sound discretion of the court. *United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988); *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987). A defendant is entitled to seek a bill of particulars in order to "identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Bortnovsky,* 820 F.2d at 574. See *United States v. GAF Corporation,* 928 F.2d 1253, 1260 (2d Cir.1991).

██ The Second Circuit has emphasized that disclosure of evidentiary detail is not the function of a bill of particulars. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir. 1990). It is not available to compel the Government to disclose the details of how it is to prove the charges within the indictment or its legal theory. *United States v. Wilson,* 565 F.Supp. 1416, 1439 (S.D.N.Y.1983) ("To require the government to specify the exact date when and the place where a particular defendant knowingly attached himself to the claimed conspiracy, the name of the person with whom he conferred about joining the conspiracy ... would unduly restrict the Government's proof.")

██ Castro–Severino requests that the Government be required to disclose numerous details of the Government's case regarding the existence of the conspiracy, including the identity of each co-conspirator, dates, times and places when each co-conspirator joined the conspiracy, and evidentiary details concerning proof of the participation of each of the co-conspirators. The information sought by Castro–Severino's motion is not necessary to provide adequate notice of the charges that he is facing. Rather, the only vehicle by which the defense can obtain this information is pursuant to Rule 16(a). To require the Government to disclose this information in a bill of particulars would necessarily compromise the Government's case.

Defendant's Motions for a Bill of Particulars are hereby DENIED.